# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2013-NMSC-049

Filing Date:  November 21, 2013

Docket No. 33,436

STATE OF NEW MEXICO,

   Plaintiff-Appellee,

v.

CHRISTOPHER SISNEROS,

   Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Robert Merle Schwartz, District Judge**

Jorge A. Alvarado, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Sri Mullis, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**BOSSON, Justice.**

**{1}**     On April 13, 2011, a jury convicted Defendant Christopher Sisneros of first-degree murder, felony murder, shooting from a motor vehicle resulting in great bodily harm, and aggravated fleeing from a law enforcement officer. Sentenced to life imprisonment plus sixteen and one-half years, Defendant appeals his conviction directly to this Court pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA.

**{2}**     For the following reasons, we affirm Defendant's first-degree murder conviction. However, because Defendant was subject to double jeopardy, we remand to the district court to vacate his convictions for felony murder and shooting from a motor vehicle, and thus, for

re-sentencing. In this opinion, we also discuss the admissibility of out-of-court statements under the U.S. Constitution and New Mexico Rules of Evidence as well as the admissibility of autopsy-related testimony by an expert lacking personal knowledge under our recent opinion in *State v. Navarette* 2013-NMSC-003, 294 P.3d 435.

## BACKGROUND

**{3}** On May 31, 2009, Robyn Bruce returned home from church with her father and children. Levi, her husband, had been at home all morning working in the yard. Robyn was washing dishes in the kitchen, and Levi was sitting on the couch watching television when his friend Francisco Navarro came over to the house. As he entered the house, Navarro asked Levi if he was expecting anyone, because a person wearing a dark beanie and sunglasses was sitting in a gray Cavalier parked in front of the house. Levi said that he was not expecting anyone, nor did he know anyone who drove a car matching that description. They both decided to walk outside the house to see who it was.

**{4}** Shortly thereafter, the sound of gunshots pulled Robyn's attention away from the dishes, and she raced to the front door knowing that Levi was outside. Standing in the doorway, Navarro told her, "Call 911. Levi's been shot." She grabbed a phone and dialed 911.

**{5}** Amid the chaos, Robyn spoke with the 911 operator and pleaded for the ambulance to arrive. She answered the operator's questions about Levi, the shooter, what had happened, and whether the shooter was still in the area. Robyn told the 911 operator what Navarro had told her about the description of the shooter and the car, as well as the direction the shooter fled. Interspersed with the questions, Robyn and her father got instructions on CPR from a firefighter who was also on the line. The ambulance eventually arrived and transported Levi to the hospital where he died.

**{6}** The 911 operator relayed the description of the suspect and the car to the first responders and police vehicles in the area. Minutes later, police officers spotted a car matching the description at a nearby intersection. The officers began pursuit, and Defendant led the police on a brief car chase. Defendant then abandoned the car and took off on foot before he was apprehended. On the ground, near the abandoned Cavalier, police found a gun and a single glove. Upon searching the car, police found a matching single glove, a black knit cap, and pair of sunglasses. Defendant was arrested and charged with the murder of Levi Bruce.

**{7}** After the presentation of evidence, a jury convicted Defendant of first-degree murder, felony murder, and shooting from a motor vehicle (which provided the felonious act required for a felony murder conviction). At sentencing, the district court "merge[d]" the felony murder and first-degree murder convictions. Additional facts will be added, as we discuss the issues raised on appeal.

**DISCUSSION**

**A.    Admitting Navarro's non-testimonial statements did not violate the Confrontation Clause**

**{8}**    At trial, Navarro did not testify about what he had seen on the day of the shooting. At the time, Navarro was incarcerated at a federal penal facility in Arizona. His statements were introduced through the testimony of Robyn Bruce. Defendant contends that Navarro's statements at the scene were testimonial in nature, and because Navarro did not testify and was not previously subject to cross-examination, Defendant was denied his constitutional right to confront the witness against him.

**{9}**    This Court reviews claimed violations of the Confrontation Clause de novo. *State v. Gurule*, 2013-NMSC-025, ¶ 33, 303 P.3d 838. One of the essential principles of confrontation jurisprudence is that an out-of-court statement may not be admitted into evidence if it is testimonial and offered to prove the truth of the matter asserted. *Navarette*, 2013-NMSC-003, ¶ 7. " '[Statements] are testimonial when . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " *Id.* ¶ 8 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006) (alterations in original)).

**{10}**    When asked by the 911 operator, Robyn Bruce relayed Navarro's statement to her describing the shooter and the gray Cavalier after the shooter had left the scene. Defendant contends that the ongoing emergency ceased at the moment the suspect left, and therefore, any information the 911 operator elicited regarding the fleeing suspect was part of the criminal investigation into past criminal conduct and was therefore, testimonial. We do not agree.

**{11}**    As this Court has observed, an ongoing emergency does not necessarily cease, rendering the information collected by an interrogator testimonial, as soon as the suspect leaves, particularly when the suspect is armed, remains on the loose, and his motives are unclear. *State v. Largo*, 2012-NMSC-015, ¶ 13, 278 P.3d 532. When an armed suspect is afoot, the scope of ongoing danger expands to include any risk to the general public as well as to law enforcement. *Id.* Courts must objectively review the circumstances of the encounter, and "the statements and actions of both the declarant and interrogator to" determine whether the primary purpose of the questions was testimonial or non-testimonial. *Id.* ¶ 17.

**{12}**    In *Largo*, this Court dealt with the admission of a *victim's* dying statement identifying the assailant to a 911 operator through another witness and to the responding police officers. *Id.* ¶ 23. Although here the identifying description was offered by a witness, not the victim, the analysis in *Largo* is on point.

**{13}**    Analyzing the statements and actions of the police investigators, *Largo* focused on

the motives of the interrogators who were asking questions to assess an ongoing emergency, the harm to the victim, and the threat to the officers and the public, such as "where the shooter went, the type of vehicle he was using, the name of the victim, the type of gun used, who the shooter was, and the [v]ictim's medical condition." *Id.* ¶¶ 18-19. In *Largo*, we concluded that the questions were not asked primarily for the purpose of preparing a case for prosecution, but rather were asked more for the purpose of meeting an ongoing emergency. *Id.* ¶¶ 19-20.

**{14}** This case is similar. The 911 operator asked questions in the wake of a sudden and unexplained shooting to gather information necessary for first responders to manage an ongoing emergency. Like *Largo,* the questions included the name and medical condition of the victim, the injury sustained, the identity of the shooter, a description of the shooter, and where the shooter went. The operator's questions do not suggest an inquiry into past criminal conduct or an effort to prepare a criminal case for investigation and prosecution.

**{15}** Analyzing the declarant's statements and actions, Navarro was outside the house with Levi Bruce when the shooting occurred. Robyn Bruce testified that after the shooting, Navarro was "in shock, just, I think, as much as I was. He was scared." The statements occurred fewer than five minutes after the 911 call began, amid Robyn's wailing and emotional responses, and before the ambulance arrived. The questions focused on the safety of the scene and how to respond to an ongoing emergency. Levi Bruce had been shot and appeared to be in critical condition. The potential assailant, armed and dangerous, had not been captured and was likely in the area.

**{16}** While Defendant asserted at trial that Navarro might have had a motive to lie, he offered no substantive evidence to support his assertion. Thus, no evidence suggests that Navarro made these statements with an idea that they would later be used in a trial against Defendant. Defendant's assertions are pure speculation.

**{17}** Viewing both Navarro's and the 911 operator's statements in the context of the events surrounding the shooting, we agree with the district court that Navarro's statements were non-testimonial. Accordingly, introduction of those statements at trial, though Defendant had no opportunity to cross-examine Navarro, did not violate Defendant's constitutional right to confrontation.

**B.    Navarro's statements were properly admitted under a recognized hearsay exception**

**{18}** Though non-testimonial, Navarro's statements were nonetheless hearsay because they were admitted through the testimony of Robyn Bruce. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Rule 11-801(C) NMRA. Hearsay is inadmissible unless it falls within one of the recognized exceptions. Rule 11-802 NMRA. We review the admission of hearsay evidence for an abuse of discretion. *State v. Leyba*, 2012-NMSC-037, ¶ 10, 289 P.3d 1215.

4

**{19}**    One of the hearsay exceptions, present sense impression, refers to "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Rule 11-803(1) NMRA. Because the statement and the event or condition occur contemporaneously, the declarant is less likely to have deliberately or consciously misrepresented the truth. *Leyba*, 2012-NMSC-037, ¶ 17. The passage of time, however, affords the declarant an opportunity to alter or misrepresent his perceptions of the event. *Id.*

**{20}**    We find no abuse of discretion in the district court's decision to admit Navarro's statements under the present sense impression exception. As discussed above, the statements were made contemporaneously with or "immediately after" the events as they unfolded——the shooting of the victim, the suspect's flight, and the need to respond quickly to an ongoing emergency. The statements described or explained both the event and the victim's condition, as Navarro had directly perceived them.

**{21}**    In response, Defendant cites *State v. Taylor*, 1985-NMCA-063, ¶¶ 35-49, 103 N.M. 189, 704 P.2d 443, in which the court assessed the reliability and trustworthiness of hearsay statements admitted under the *residual* exception to the hearsay rule. Defendant argues that even if Navarro's statements qualified as non-testimonial, present sense impressions, the district court erred by not undergoing an additional assessment of the reliability and trustworthiness of Navarro's statements, independent of the criteria for a present sense impression. We are not persuaded. *Taylor* does not hold that a court must independently assess the reliability and trustworthiness of a statement that qualifies under one of the established exceptions to the hearsay rule like present sense impressions. *Taylor*'s concerns were directed solely to the residual exception which applies only when a hearsay statement does *not* conform to a recognized exception. *See Taylor*, 1985-NMCA-063, ¶¶ 50-56; *see also* Rule 11-807 NMRA.[1] Defendant's hearsay objections to Navarro's statements are without merit.

## C.    The district court correctly excluded the investigator's testimony about Navarro not recalling the murder

**{22}**    Faced with Navarro's statements describing Defendant and his car, Defendant then sought to impeach Navarro's credibility. Navarro was not available to testify in person because he was incarcerated in Arizona. Defendant's investigator attempted to contact Navarro to arrange for defense counsel to interview him at the Arizona facility. The investigator spoke with Navarro's caseworker at the penal facility and was told that: (1) Navarro did not wish to speak to him, and (2) Navarro knew nothing about the incident.

---

[1]Rule 11-807 replaced the catch-all exception formerly in Rule 11-803 and Rule 11-804 with no intended change in meaning to track the changes to the Federal Rules of Evidence. *See* Committee Commentary, Rule 11-803 NMRA.

**{23}** At trial, Defendant attempted to have his investigator testify about what Navarro had allegedly told the caseworker, namely that, at least while in prison, Navarro denied knowing anything about the incident, contrary to what Navarro told Robyn Bruce at the scene of the murder. However, the district court refused to allow the investigator to testify to double hearsay, concluding that the proper witness would have been the caseworker, who had talked directly with Navarro, as opposed to the investigator, who had not.

**{24}** Citing Rule 11-806 NMRA, Defendant argues that the district court erred when it barred Defendant's investigator from testifying. Rule 11-806 provides:

> When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. . . . [Including a] declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.

We agree with the district court that the investigator was not the proper party to testify about Navarro's inconsistent statements or recantation in this case. Even though Rule 11-806 allows a hearsay declarant's credibility to be attacked, it does not suspend the other rules of evidence to do so. The district court correctly ruled that the investigator's testimony was inadmissible.

**D.      The district court incorrectly allowed testimony about the victim's autopsy from a witness with no personal knowledge**

**{25}** The forensic pathologist who performed the autopsy on Levi Bruce, Dr. Aurelius, was not available to testify at trial. Instead, the State qualified another forensic pathologist, Dr. Brooks, as an expert to give her opinion regarding the cause and manner of death. Dr. Brooks was employed at the Office of the Medical Investigator ("OMI") at the time of trial, but she was not present at Bruce's autopsy. Her trial testimony regarding the cause and manner of death was based on her review of the autopsy records, but the autopsy report itself was not introduced into evidence. However, a diagram prepared by the pathologist who performed the autopsy showing the trajectories of the multiple bullets and photographs taken during the autopsy did come into evidence through Dr. Brooks's testimony.

**{26}** Defendant asserts that his right to confrontation was circumvented by allowing Dr. Brooks to testify in place of Dr. Aurelius, because Dr. Brooks did not perform the autopsy, and Defendant had no opportunity to cross-examine Dr. Aurelius. Defendant asserts that this case is nearly identical to the circumstances that were recently before this Court in *State v. Navarette*, 2013-NMSC-003, 294 P.3d 435, an opinion that issued after the trial in this matter.

**{27}** In *Navarette*, a substitute forensic pathologist testified about the distance of the gun

6

from the victim when it was fired "based on the observations recorded in the autopsy report." *Id.* ¶ 3. The distance of the gun from the victim was important to the defense, because the issue in dispute was whether the defendant or another person, who was closer to the victim, shot the victim. *Id.* ¶ 6. The pathologist based his testimony on the lack of "evidence of soot or stippling [on the victim's] body or clothing" and suggested that the lack of evidence established that the shooter had been further away from the victim at the time he was shot. *Id.* The prosecution emphasized this testimony at closing. *Id.*

**{28}** However, the pathologist also testified that "evidence of soot, stippling, or gunpowder cannot always be easily seen by the naked eye . . . and therefore autopsy photographs . . . would not necessarily capture such evidence." *Id.* ¶ 21. Thus, "the autopsy findings [did] not involve objective markers that any third party [could] examine in order to express an independent opinion as to the existence or non-existence of soot or stippling." *Id.* This Court observed, "[s]uch observations are not based on any scientific technique that produces raw data, but depend entirely on the subjective interpretation of the observer." *Id.* Accordingly, in *Navarette,* we held that it was constitutional error to allow a substitute pathologist to testify regarding the subjective observations of the pathologist who actually performed the autopsy and prepared the report, when the defendant had no meaningful opportunity to cross-examine the source of those observations. *Id.* ¶ 23.

**{29}** In the case before us, Dr. Brooks, the substitute pathologist, testified that Levi Bruce's death resulted from multiple gunshot wounds. In forming her opinion, Dr. Brooks relied on the autopsy report, diagrams produced by the forensic pathologist who performed the autopsy, medical reports, the field-investigator report, the toxicology report, photographs and x-rays taken during the autopsy, and photographs taken at the scene of the homicide. Dr. Brooks did not prepare any of these reports or any of the supporting documentation.

**{30}** As this Court has previously stated, an expert witness may offer an expert opinion based on raw data, such as autopsy photographs of entry and exit wounds taken by others. *Id.* ¶ 22. However, an expert may not "simply parrot the opinion or subjective statement of the pathologist who performed the autopsy and took the photographs." *Id.*

**{31}** In her testimony, Dr. Brooks demonstrated the trajectories of the bullets to the jury using the diagram prepared by the autopsy pathologist; she also referred to Dr. Aurelius's report numerous times instead of relying on raw data to express her own independent opinion. Dr. Brooks referred to the contents of Dr. Aurelius's autopsy report "in order to accurately tell the jury every single structure of importance that that missile hit as it went [on its way] through the body." By allowing Dr. Brooks essentially to parrot Dr. Aurelius's subjective statements, the district court transgressed the boundaries we set forth in *Navarette*.

**E.      The constitutional error in Dr. Brooks's testimony was harmless**

**{32}** "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. We

7

review the effect of this error under a constitutional error standard. *Id.* ¶ 28. When a district court admits evidence that creates a constitutional error, we review the admission of that evidence and affirm only if we are satisfied that there is no "reasonable possibility" that the error affected the verdict. *Id.* ¶ 36. "[H]armless error review necessarily requires a case-by-case analysis," questioning whether the guilty verdict in this particular case is attributable to this particular error. *Id.* ¶ 44. For the following reasons we are satisfied that the error had no such effect.

**{33}**     In this case, the cause and manner of death were never in dispute, only the identity of the shooter. Using the autopsy report, Dr. Brooks testified that the cause and manner of death resulted from multiple gunshot wounds; all her testimony about the bullet trajectories, the entry and exit wounds, and the fact that four bullets were recovered from Bruce's body went solely to that question. In fact, Defendant does not claim any prejudice from Dr. Brooks's testimony about the cause of death because it was never at issue. Accordingly, although Dr. Brooks should not have been permitted to testify in this manner about an autopsy in which she did not participate, our review of the record persuades us that her testimony regarding the cause and manner of death had no effect upon the verdict.

**F.      That Defendant had no opportunity to cross-examine Dr. Aurelius about the extraction of the bullets and the markings upon them was not error**

**{34}**     Defendant appears to argue that he was denied the opportunity to present a defense because he was unable to cross-examine Dr. Aurelius. Defendant alleges that marks on the bullets extracted from Bruce's body during autopsy tied him to the murder weapon. Dr. Aurelius performed the extraction of the bullets, and therefore, Defendant contends that only Dr. Aurelius could testify about any marks she may have created. Defendant states that he would have asked Dr. Aurelius about the possibility that she made the identifying marks in the process of extracting the bullets, thereby undermining any testimony that the marks were created by firing the bullets from the firearm ("Glock") recovered near Defendant's car. Finally, Defendant argues that because Dr. Brooks testified about "how Dr. Aurelius recovered the bullets," and Dr. Aurelius did not testify, Defendant's right to confrontation was violated.

**{35}**     Defendant's argument mischaracterizes the evidence. Dr. Brooks testified regarding the standard procedures for preserving evidence recovered during an autopsy. She further testified that based on her review of the OMI file it appeared that Dr. Aurelius followed all the procedures. Dr. Brooks did not testify about how the bullets were extracted or whether it would be possible that they were marked in the process of extraction.

**{36}**     Kim Haag, the State's forensic firearm and tool mark expert, and not Dr. Brooks, introduced evidence regarding any identifying marks on the recovered bullets. Ms. Haag was subject to cross examination. Further, the marks that were on the bullets did not link them to the Glock. Thus, Defendant's proposed defense holds no water. Haag testified that the Glock fired bullets of the same caliber as those recovered from Levi Bruce's body. However,

8

the same expert could *not* testify that these bullets were fired from this particular Glock. According to the expert, the results were inconclusive:

> State: And what about the other four projectiles? Did you do a comparison of those?
>
> Haag: I did.
>
> State: And what did you find?
>
> Haag: The four projectiles, and they are identified as P-300, P-301, -302 and -303, couldn't either be identified nor excluded as having been fired from the Glock firearm, F-1.
>
> State: What does that mean, exactly?
>
> Haag: Well, that means that I did not have sufficient marks in order to make a determination, one way or the other.

**{37}** Therefore, contrary to Defendant's premise, he was not tied to the alleged murder weapon through marks on the bullets. If there had been sufficient marks on the recovered bullets, and those marks established that the bullets in question were fired from the Glock, and the Glock was consequently the murder weapon, then Defendant might have had a reason to question whether those identifying marks could have been made through some other means. As the facts stand, the marks were not harmful to the Defendant's case, and thus could not cause prejudice. Defendant's claim of prejudice because Dr. Aurelius was not available to testify about the possibility that she marked the bullets simply has no merit.

## G. Defendant was subject to Double Jeopardy

**{38}** Defendant contends that when the district court merged his sentences for felony murder and first-degree murder, his right to be free from double jeopardy was violated. The State concedes that Defendant's conviction for felony murder should be vacated and not just merged for sentencing purposes. We agree. This Court has stated that merging the sentence of the lesser offense into the greater to be served concurrently does not satisfy the constitutional requirements protecting a citizen from double jeopardy. *State v. Schoonmaker*, 2008-NMSC-010, ¶ 50, 143 N.M. 373, 176 P.3d 1105. To satisfy double jeopardy protections, the district court judge must explicitly vacate one of the convictions. *State v. Garcia*, 2011-NMSC-003, ¶ 39, 149 N.M. 185, 246 P.3d 1057.

**{39}** Defendant also contends that his convictions for first-degree murder and shooting from a vehicle violate double jeopardy, because his conduct was "unitary: the same shots, fired at the same time, establish both the charges." In *State v. Montoya*, 2013-NMSC-020, ¶ 54, 306 P.3d 426, this Court recently dealt with a similar situation. There, we stated that

9

"where both convictions were premised on the unitary act of shooting [the victim]" one must be vacated. *Id.* (holding that when a conviction for homicide and for shooting at a motor vehicle resulting in great bodily harm are premised on the same unitary act one of the convictions must be vacated).

**{40}** Further, under New Mexico law, where double jeopardy protections require that one or more otherwise valid convictions be vacated, "we must vacate the conviction carrying the shorter sentence." *Id.* ¶ 55. Since the conviction for shooting from a motor vehicle carries the shorter sentence, we vacate that conviction and uphold the first-degree murder conviction. *Compare* NMSA 1978, § 30-2-1(A)(1) (1994) (murder in the first degree is capital offense), *and* NMSA 1978, § 31-18-14 (2009) (the penalty for a capital offense is "life imprisonment or life imprisonment without possibility of release or parole"), *with* NMSA 1978, § 30-3-8(B) (1993) (shooting from a motor vehicle resulting in great bodily harm is a second degree felony), *and* NMSA 1978, § 31-18-15(A)(4) (2007) (the basic sentence for a second degree felony resulting in death is fifteen years' imprisonment).

**CONCLUSION**

**{41}** We remand to the district court to vacate Defendant's convictions for felony murder and shooting from a motor vehicle and order that he be re-sentenced in accordance with this opinion.

**{42}** **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

**Topic Index for *State v. Sisneros*, No. 33,436**

**APPEAL AND ERROR**

10

Harmless Error

**CONSTITUTIONAL LAW**
Double Jeopardy

**CRIMINAL LAW**
Felony Murder
Murder
Shooting Offence

**CRIMNAL PROCEDURE**
Double Jeopardy
Right to Confrontation

**EVIDENCE**
Hearsay

**JUDGES**
Abuse of Discretion