This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

　　　Plaintiff-Appellee,

v.                                                            **No. A-1-CA-34925**

**DENNIS ESCOVEDO,**

　　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF MORA COUNTY**
**Matthew J. Sandoval, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Elizabeth Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**KIEHNE, Judge.**

**{1}** Defendant Dennis Escovedo was convicted of second-degree murder for

killing Maxine Patsy Trujillo (Ms. Trujillo), contrary to NMSA 1978, Section 30-

2-1(B) (1994); tampering with evidence by cleaning blood stains at a crime scene, contrary to NMSA 1978, Section 30-22-5 (2003); and making unlawful withdrawals from Ms. Trujillo's bank account, contrary to NMSA 1978, Section 58-16-16(B) (1990). The district court sentenced Defendant to twenty-two and one-half years in prison.

{2}     Defendant challenges his conviction[1] on four grounds, arguing that the district court erred in: (1) denying a motion to suppress Defendant's incriminating statements obtained during a custodial interrogation after Defendant allegedly invoked his right to remain silent; (2) denying a motion to suppress the testimony of the State's expert witness and photographs taken during the autopsy of the deceased; and (3) admitting testimony about blood spatter as evidence of prior bad acts, thereby (4) resulting in cumulative error.

{3}     Because settled New Mexico law squarely controls the issues Defendant has raised on appeal, we reject each of his claims of error. We hold that Defendant did not unequivocally invoke his Fifth Amendment right to remain silent; the autopsy photographs depicting Ms. Trujillo's wounds did not implicate Defendant's Sixth

---

[1] Defendant does not clearly indicate whether he challenges all of his convictions or the second-degree murder conviction alone. To the extent Defendant challenges the convictions for tampering with evidence or unlawful withdrawal from a bank account, we deem those claims meritless based on the arguments raised in Defendant's brief in chief.

2

Amendment[2] right to confront the witnesses against him; and no cumulative error occurred. Finally, we do not address the claim challenging the admission of blood-spatter evidence because it was not adequately developed for appellate review. Accordingly, we affirm the district court's judgment.

## I.  BACKGROUND

{4}    Defendant and Ms. Trujillo were dating and in December 2010 they lived together in Defendant's home in Las Aguitas in Mora County. Defendant stated that on December 30, 2010, he and Ms. Trujillo hitchhiked into Mora to withdraw money from an ATM. They bought groceries and hitchhiked back to Defendant's home. Ms. Trujillo wanted cigarettes and additional cash, so Defendant hitchhiked back into town alone. Defendant stated that when he returned home a few hours later, Ms. Trujillo was gone. He said that the last time he saw her was before returning to town to purchase cigarettes and get additional cash. He also said she

---

[2]Defendant does not clearly indicate whether he is claiming relief under Article II, Section 14 of the New Mexico Constitution or the Sixth Amendment to the United States Constitution. We neither see a justification for interpreting the two provisions inconsistently or otherwise deviating from federal law, *see State v. Lopez*, 2013-NMSC-047, ¶¶ 12-18, 314 P.3d 236, nor are we required to determine whether the state constitution may provide greater protection to an arrestee than the federal constitution absent an argument in the briefing. *See State v. Harbison*, 2007-NMSC-016, ¶ 26, 141 N.M. 392, 156 P.3d 30. We therefore analyze Defendant's claim under the Sixth Amendment alone. *See State v. Gonzales*, 2012-NMCA-034, ¶ 6, 274 P.3d 151 ("The Sixth Amendment applies to the states through the Fourteenth Amendment.").

was wearing a grey long john shirt, a black jacket, blue jeans, and white tennis shoes.

{5}    On January 29, 2011, Ms. Trujillo's sixteen-year-old daughter asked the New Mexico State Police to conduct a welfare check because she had not heard from her mother since late December 2010. The daughter described her mother as having tattoos and as having had surgery on her pelvis. Officer Frank Chavez visited Defendant's residence in Las Aguitas, but no one was there.

{6}    Then, on February 14, 2011, Defendant's neighbors, Jerry Tenorio and Wendy Capek, discovered a decomposing skull on their property when Ms. Capek noticed her dogs playing with what appeared to be a human skull. Officer Clay Goret visited the scene and took photographs of the skull. Officer Goret and other officers searched the immediately adjacent area for a burial that could be the source of the human remains found on the Tenorio property, but found nothing.

{7}    Then, during a search for additional evidence on the adjacent property, where Defendant resided, Officer Goret discovered human remains near a ravine. The human remains, which were partially clothed and heavily scavenged by animals, were approximately 225 yards from the Tenorio property. Officer Goret noted that the human remains included white tennis shoes, blue jeans, a grey shirt, and a black jacket; a metal medical device was inserted in the hip; and the head was not present. Officer Goret testified that he believed the human remains were

4

connected to the human skull found on the Tenorio property, because hair found near the human remains was consistent with the color and approximate length of hair present on the skull.

{8} Officer Goret also observed a heart tattoo, which read "Quintana," on the lower part of one of the body's legs, which matched the description of Ms. Trujillo's tattoo that her daughter had provided to Officer Chavez at the time of the January 29, 2011 welfare check. Based on this information and his additional observations of the pelvic device on the body, Officer Goret suspected that the remains were those of Ms. Trujillo. Noting that the human remains were located approximately 300 yards east of Defendant's residence, Officer Goret then obtained a search warrant for Defendant's home.

{9} During the search of Defendant's residence, Officer Goret found a black wallet in a cabinet containing an electronic benefits transfer card and other contents bearing the name "Maxine Trujillo." Officer Goret also found evidence of suspected human bloodstains on the ceiling, a faucet, a sink, a cabinet door, and a chair in Defendant's residence, as well as evidence of attempts to clean up some of the reddish brown stains.

{10} As part of his investigation, Officer Goret obtained video from the ATM where Defendant and Ms. Trujillo withdrew money from Ms. Trujillo's bank account on December 30, 2010. He also obtained video from an ATM showing

Defendant withdrawing money from Ms. Trujillo's bank account on January 2, 2011 and on January 14, 2011. Officer Goret also attended an autopsy of the human remains.

{11}     Ms. Trujillo's daughter identified the human remains as belonging to her mother, based on the tattoos on Ms. Trujillo's legs bearing the names "Paloma," "John," and "Quintana." Based on all of the information, Officer Goret determined that the deceased was Ms. Trujillo.

**A.     Custodial Interrogation**

{12}     Defendant was arrested in October 2013. At issue on appeal is the following portion of the custodial interrogation that followed Defendant's arrest and *Miranda* warning:

Officer Goret:     Do you understand these rights?

Defendant:         Yeah.

Officer Goret:     Having those rights in mind do you want to talk about what's going on?

Defendant:         Well, I don't really know what's going on, I mean.

Officer Goret:     Well, you understand—

Defendant:         We already went through this . . .twice. And I mean.

Officer Goret:     I am sure you know that we have some questions.

Defendant:         Right.

6

Officer Goret:     Okay. And, this is what it is . . . you know, [Ms. Trujillo is] dead.

Defendant:        Uh-huh.

Officer Goret:     Okay. Based on everything that we've discovered, you know, it puts you in a bad light.

Defendant:        In a bad what?

Officer Goret:     In a bad light. Okay. So the reason why we're doing this, we want to give you the opportunity to talk to us and tell us your side of what happened. I told you a long time ago, that's all I was interested in was your side. Okay.

Defendant:        Okay like me, I don't know who she was involved with but they attacked us at our house.

Officer Goret:     Okay.

Defendant:        At my house.

Officer Goret:     Okay.

Defendant:        [inaudible] I'm even afraid to go to my own house. . . . [S]ince this happened, they've been breaking into my house. I don't know who.

Officer Goret:     Okay.

Defendant:        They destroyed my house. And I don't know whose doing all this, all this . . . .

Officer Goret:     You understand your rights that you told me earlier do you?

Defendant:        Yeah.

Officer Goret: Do you want to talk to us about this because I want to talk to you. I know you have questions. I can answer some of those questions.

Defendant: Yeah.

Officer Goret: I'm sure you understand that we have some questions. If you want to talk to us we have this—

Defendant: Yeah. That's the only thing you're asking me is I'm telling you is that I'm afraid to go to my own house because since we got attacked.

Officer Goret: Okay. But you understand, you understand your rights?

Defendant: Right.

Officer Goret: And you want to talk?

Defendant: Yeah.

Officer Goret: Okay. Do you want to sign this form? You don't have to. We just need to make sure that you understand your rights.

Defendant: Yeah I do.

Officer Goret: You do understand your rights and you're not intoxicated at this time?

Defendant: Well, that's all I got to say.

Officer Goret: Okay. Now, you said people attacked you?

Defendant: Well. They broke into my house.

Officer Goret: When did that happen?

8

{13}     The district court held a hearing on Defendant's motion to suppress all statements made after he said, "Well that's all I got to say," on the basis that Defendant invoked his right to remain silent. The district court found that Defendant's statement was ambiguous in context, and interpreted Defendant's statement to mean he had nothing further to say about the previous break-ins, and therefore denied the motion to suppress.

**B.     Presentation of Photographs at Trial**

{14}     At trial, Dr. Justin Lyell Hazen was admitted as an expert in blunt and head trauma on behalf of the State. Dr. Hazen testified that he reviewed a CD containing photographs of the human remains and the scene (Trial Exhibits 10A, 10B, 10C, 10D); and another CD containing the autopsy report for Ms. Trujillo, Ms. Trujillo's medical records, police reports, a forensic pathology report, and "witness statements [and] . . . other . . . investigative stuff." Dr. Hazen did not participate in any of the laboratory testing, did not participate in the autopsy, and was not present when the autopsy photos were taken. Dr. Hazen testified that based on his review of the records he reached his own conclusions and opinion about the cause and manner of Ms. Trujillo's death, which was that a significant amount of force fractured her skull, causing a lethal injury that resulted in her death.

{15}     The district court ruled at trial on Defendant's oral objections that Dr. Hazen did not participate in the autopsy, and allowed Dr. Hazen to testify about the

records he reviewed, his review of the photographs attached to the autopsy report, and his independent conclusion of what happened to Ms. Trujillo, including his opinion that she was the person depicted in the photographs of the skull and the human remains. Also over Defendant's Confrontation Clause objection, the district court admitted the photographs of the human remains taken during the autopsy into evidence during Officer Goret's testimony, because he was present when the photographs were taken and could testify about his observations of the human remains during the autopsy. The autopsy report itself was neither offered nor admitted into evidence.

## II.  DISCUSSION

## A.  Standard of Review

{16}  In reviewing the denial of the motion to suppress Defendant's statements, "we defer to the district court's findings as long as the findings are supported by substantial evidence, and we review de novo the district court's application of the law to those facts." *State v. King*, 2013-NMSC-014, ¶ 4, 300 P.3d 732.

{17}  "Questions of admissibility under the Confrontation Clause are questions of law, which we review de novo." *State v. Gonzales*, 2012-NMCA-034, ¶ 5, 274 P.3d 151 (internal quotation marks and citation omitted). "Generally, we review admissibility of evidence, including expert opinion, for an abuse of discretion." *Id.*

## B.  Defendant's Fifth Amendment right to remain silent was not violated and therefore his statements were properly admitted into evidence

10

**{18}** Defendant asserts that because the interrogating officer continued to question him after he invoked his right to remain silent by saying "Well, that's all I got to say[,]" the district court's admission of Defendant's statements made during the interrogation was in error. The State argues in response that Defendant's statement, "Well, that's all I got to say[,]" was ambiguous when put into context and did not constitute an unequivocal invocation of his right to remain silent. Further, the State argues that Defendant expressly and impliedly waived his right to remain silent by continuing to talk with the interrogating officers. The narrow issue before this Court is not whether the interrogating officer continued to question Defendant after he invoked his right to remain silent, as Defendant asserts, but whether Defendant unequivocally invoked his right to remain silent in the first place.

**{19}** "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *King,* 2013-NMSC-014, ¶¶ 3, 7 (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-474 (1966)). The statement, " 'if the individual indicates in any manner' has been clarified to mean that a suspect must make an unambiguous statement invoking the right to remain silent." *King*, 2013-NMSC-014, ¶ 8 (alteration and citation omitted).

11

{20} The standard for determining whether an alleged invocation is ambiguous is whether a "reasonable officer in light of the circumstances, would have understood only that the suspect might be invoking" his right to remain silent. *State v. Barrera*, 2001-NMSC-014, ¶ 31, 130 N.M. 227, 22 P.3d 1177 (emphasis, internal quotation marks, and citation omitted). For example, in *State v. Perry,* 2009-NMCA-052, ¶ 22, 146 N.M. 208, 207 P.3d 1185, this Court held that the defendant did not invoke his Fifth Amendment right to remain silent by saying, "I ain't really got too much to say[,]" because the words communicated only that the defendant was not well-informed. On the other hand, in *King,* our Supreme Court held that the defendant's statements in response to officers' requests to speak with him—"[n]ot at the moment[, k]ind of intoxicated" and "[l]ike I said, not at the moment"—were unambiguous, clear negative expressions. 2013-NMSC-014, ¶¶ 5, 8-10 (alteration and internal quotation marks omitted). Our Supreme Court held that the defendant invoked the right to remain silent as it was obvious that the officer understood the suspect did not want to answer any questions. *Id.* ¶ 10. For examples of other ambiguous statements, *see Barrera,* 2001-NMSC-014, ¶ 31 (holding that the statement, "Do I need an attorney?" was ambiguous and therefore not an invocation of the right to counsel (internal quotation marks omitted)); and *State v. Castillo-Sanchez,* 1999-NMCA-085, ¶ 17, 127 N.M. 540, 984 P.2d 787 (holding that the defendant's statement "Who can help me?" was ambiguous because it

12

could have been a request for counsel or family aid, spiritual help, or moral support, and because the exchange with the officer immediately afterward suggested that the defendant was not asking for an attorney (internal quotation marks omitted)).

{21} Here, Defendant's statement "Well, that's all I got to say[]" was ambiguous. When put into context, it may well refer only to the prior discussion about break-ins at Defendant's residence. In any event, it is more like the statement in *Perry* than *King* because it does not express any clear desire to remain silent. Defendant also said more than once during the same conversation that he understood his rights and was fine with answering questions. We therefore hold that Defendant's statement was ambiguous and did not unequivocally invoke his right to remain silent. Because we hold that Defendant did not unequivocally invoke his right to remain silent, and therefore uphold the district court's ruling admitting his statements into evidence, we need not consider the State's argument that Defendant waived his right to remain silent through his conduct during the interrogation.

**C. Defendant's Sixth Amendment right to confront the witnesses against him was not violated by the district court's admission of expert testimony and the autopsy photographs**

{22} Defendant argues that the district court improperly admitted (1) testimony of the State's expert witness, Dr. Hazen, about the autopsy; and (2) the photographs

13

of the skull contained in the autopsy report, because Dr. Hazen did not perform the autopsy and was not present when the photographs were taken. The State argues in response that because Dr. Hazen offered his independent opinion and did not parrot the subjective opinion of the pathologist who performed the autopsy, and because Officer Goret was present at the autopsy the expert testimony and photographs were properly allowed. We are tasked with determining whether the autopsy photographs are testimonial in nature and whether the State's expert witness, Dr. Hazen, drew his own conclusions from the data collected by the pathologist who performed the autopsy.

{23} "The Confrontation Clause guarantees the accused in a criminal trial the right to be confronted with the witnesses against him, regardless of how trustworthy the out-of-court statement may appear to be." *State v. Mendez*, 2010-NMSC-044, ¶ 28, 148 N.M. 761, 242 P.3d 328 (internal quotation marks and citation omitted); *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313 (2009); *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004). "As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *State v. Jaramillo,* 2012-NMCA-029, ¶ 8, 272 P.3d 682 (internal quotation marks and citation omitted)

**1.     Autopsy photographs are not testimonial**

{24} Autopsy reports prepared by the Office of the Medical Investigator are testimonial for purposes of a Confrontation Clause analysis. *See State v. Navarette,* 2013-NMSC-003, ¶¶ 15-17, 294 P.3d 435. "But not all material contained within an autopsy file is testimonial." *State v. Smith,* 2016-NMSC-007, ¶ 44, 367 P.3d 420 (internal quotation marks and citation omitted). "It is well settled in other jurisdictions that photographs are not generally testimonial statements." *Id.* ¶ 44. "We agree that . . . autopsy photograph[s] depicting a murder victim's wounds . . . do not constitute testimonial statements and therefore do not invoke the Sixth Amendment." *Id.* (citation omitted).

{25} Here, it is undisputed that Trial Exhibits 10A, 10B, 10C, and 10D were photographs of Ms. Trujillo's wounds. Because the autopsy report itself was not admitted into evidence or read into evidence, the cases that Defendant cites are inapplicable. *See Bullcoming v. New Mexico*, 564 U.S. 647, 659-68 (2011) (holding that admission of a DWI laboratory report prepared by a person who did not perform the testing was a violation of the defendant's right to confrontation); *Jaramillo*, 2012-NMCA-029, ¶¶ 19, 20 (holding that the substitute expert's reading of the autopsy report into evidence and the admission of the autopsy report into evidence, where the substitute expert did not perform the autopsy violated the defendant's confrontation rights). The photographs themselves are otherwise not

testimonial in nature, and therefore, admitting the photographs (and not the autopsy report as a whole) did not implicate Defendant's confrontation rights.

**2.      An expert may testify about his or her independent conclusions**

{26}      Our Supreme Court has stated that "an expert could not testify based on the contents of someone else's autopsy report, though an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause." *Smith*, 2016-NMSC-007, ¶ 42 (internal quotations marks and citation omitted); *accord Navarette*, 2013-NMSC-003, ¶ 22 (citing *State v. Aragon*, 2010-NMSC-008, ¶¶ 26-30, 147 N.M. 474, 225 P.3d 1280); *Gonzales*, 2012-NMCA-034, ¶ 6. This Court further explained:

> [A]n expert who has analyzed the raw data generated by another analyst and who has formed independent conclusions based upon that analysis may testify as to those conclusions. . . . What has emerged as clearly impermissible is an expert's testimony which is based solely upon a non-testifying analyst's analysis and conclusions. . . . Under this impermissible scenario, the expert will have failed to form an independent opinion and is merely acting as a conduit for the presentation of a non-testifying witness's testimonial hearsay. This practice, commonly referred to as 'parroting,' is a violation of the right to confrontation.

*State v. Huettl,* 2013-NMCA-038, ¶¶ 36-38, 305 P.3d 956 (citations omitted). *Compare State v. Sisneros*, 2013-NMSC-049, ¶ 31, 314 P.3d 665 (holding that the defendant's confrontation rights were violated because the testifying expert "demonstrated the trajectories of the bullets to the jury using the diagram prepared by the autopsy pathologist; she also referred to [the autopsy pathologist's] report

16

numerous times instead of relying on raw data to express her own independent opinion[,]" and "essentially . . . parrot[ed the autopsy pathologist's] subjective statements[.]"), *with Gonzales,* 2012-NMCA-034, ¶¶ 1, 19 (holding that the prospective cause-of-death testimony of a doctor who did not perform the autopsy would be permissible under the Sixth Amendment provided that the testimony consisted of the doctor's own opinions based on her review of the raw data from the autopsy).

**{27}** For example, in *Navarette,* our Supreme Court discussed both an impermissible and permissible use of another expert's report. First, the Court held that the Confrontation Clause was violated because "the autopsy findings [did] not involve objective markers that any third party [could] examine in order to express an independent opinion as to the existence or non-existence of soot or stippling" for purposes of determining which of the two individuals fired the fatal shots. *Navarette,* 2013-NMSC-003, ¶¶ 6, 21, 23. In addition, the "autopsy photographs . . . would not necessarily capture such evidence [of soot, stippling, or gunpowder, which cannot always be easily seen by the naked eye and often ends up on the clothing, rather than the skin]." *Id.* ¶ 21. In other words, a subsequent pathologist could not arrive at an independent conclusion about the presence of soot or stippling because there was no raw data to review.

17

**{28}** Conversely, "after being shown the autopsy photographs, [the testifying analyst] expressed his own opinion about the entry and exit wounds, explaining the basis for his opinion." *Id.* ¶ 22. "He did not simply parrot the opinion or subjective statement of the pathologist who performed the autopsy and took the photographs. . . . [H]e was available for cross-examination." *Id.*; *see Sisneros,* 2013-NMSC-049, ¶ 30 ("[A]n expert witness may offer an expert opinion based on raw data, such as autopsy photographs . . . taken by others.").

**{29}** Here, Dr. Hazen testified that he reviewed many records, including the autopsy report containing raw data. He made no other reference to the autopsy report itself and did not rely on any conclusion within the autopsy report as the basis for his opinion. New Mexico law does not require him to have been at the autopsy, only that he independently arrive at his own conclusion based on the raw data gathered at the autopsy. Dr. Hazen testified that he arrived at his own independent conclusion based on his review of Ms. Trujillo's medical records, photographs, police reports, and other investigative material. It cannot be said that he parroted the autopsy report where he did not reference it in his analysis or testimony beyond the non-testimonial photographs depicting Ms. Trujillo's injuries. Dr. Hazen's testimony, therefore, did not implicate Defendant's confrontation rights.

18

**{30}** We hold that Dr. Hazen drew his own conclusions about the cause of Ms. Trujillo's death from the underlying data, and that the autopsy photographs in this case were not testimonial in nature, so the district court did not err in allowing the testimony and admitting the photographs.

## D. Defendant's claim that blood-spatter evidence was improperly admitted is waived as undeveloped

**{31}** Defendant argues, citing *State v. Franklin,* 1967-NMSC-151, ¶ 9, 78 N.M. 127, 428 P.2d 982 and *State v. Boyer*, 1985-NMCA-029, ¶ 17, 103 N.M. 655, 712 P.2d 1, that the admission of the blood-spatter evidence was improperly admitted as evidence of Defendant's propensity to commit violent acts, was irrelevant to his state of mind, and was more prejudicial than probative. Defendant does not explain the context surrounding the blood-spatter evidence, such as how, where, or when it was discovered; he does not explain how the question of its admission arose, what the parties' arguments were, or the district court's rationale for admitting the evidence; and he does not point this Court to any legal support for his contention that it should not have been admitted. Defendant has therefore not adequately developed this argument for appellate review, and we decline to develop an argument for him. *See Headley v. Morgan Mgmt. Corp.,* 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."); *see also McNeill v. Rice Eng'g & Operating, Inc.,* 2010-NMSC-015, ¶ 11, 148 N.M. 16, 229 P.3d 489 ("Where [a

party has] failed to cite any contrary authority from this or any other jurisdiction, [the appellate courts] will presume that no such authority exists."). We therefore decline to address this issue.

**E.      No cumulative error is present**

**{32}**    Defendant argues that all of the claimed errors he has raised on appeal constitute cumulative error requiring the reversal of his conviction. *See State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61 (stating that "[t]he doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial").

**{33}**    We have already concluded that Defendant did not adequately brief the blood-spatter claim and that Defendant's other claims are without merit. The cumulative error claim is therefore meritless. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 ("Where there is no error to accumulate, there can be no cumulative error." (alteration, internal quotation marks, and citation omitted)).

**III.    CONCLUSION**

**{34}**    We hold that Defendant's rights to remain silent and confront the evidence against him were not violated. We hold that the admission of Defendant's statements and the autopsy photographs, and the allowance of Dr. Hazen's expert testimony, were within the sound discretion of the district court. Nor is any

cumulative error present in this case. Accordingly, we affirm the district court's judgment.

{35} **IT IS SO ORDERED.**

_____
**EMIL J. KIEHNE, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**STEPHEN G. FRENCH, Judge**

21