The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: May 11, 2026

**NO. S-1-SC-40256**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**CASTULO ARAGON, JR.,**

Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Jared G. Kallunki, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly M. Chavez Cook, Appellate Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Michael J. Thomas, Assistant Solicitor General
Albuquerque, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

{1}     Defendant Castulo Aragon, Jr., was convicted by a jury of the first-degree murder of his wife, Maria Aragon (Victim), and three counts of tampering with evidence. Defendant chose to represent himself at the trial. On direct appeal to this Court he now raises approximately twenty various arguments that can be distilled to: (1) issues related to the admission of lay testimony; (2) issues related to the admission of expert testimony and whether Defendant's right to confront witnesses under the Sixth Amendment was violated; (3) issues related to the sufficiency of the evidence supporting Defendant's convictions; (4) whether the count three conviction is barred by double jeopardy; and (5) whether prosecutorial misconduct occurred. We conclude that none of Defendant's arguments warrant a new trial, and we affirm the jury's verdict on counts one, two and four. However, we remand the case to the district court for dismissal of Defendant's count three conviction for tampering with evidence because it is barred by double jeopardy.

**I.     BACKGROUND**

{2}     Victim and Defendant met in December, 2015, and married four months later, in April, 2016. Victim and Defendant knew each other for a total of fifteen months when she was murdered in March, 2017, and they were married for eleven of those

months. On Monday, March 6, 2017, at approximately 9:40 a.m., Victim was found deceased by the side of the road along Highway 285 north of Roswell, New Mexico. She was lying face down near some large piles of gravel. Her bloody sweater was on backward and her hair was matted with blood.

{3}     There was no evidence of blood dripping down onto Victim's clothes, despite significant head trauma. There was no blood on the ground, even though Victim had significant injuries. Nor was there evidence that Victim walked to the location where she was discovered. The evidence suggested that Victim was transported to the scene, was "deposited" where she lay, and was not there long before she was discovered.

{4}     Expert witness testimony revealed that Victim received three different types of fatal injury. She was strangled, stabbed in the chest, and struck in the head with a blunt object. Victim lived for six to twenty-four hours from the time of the head injuries, which resulted in internal skull fracture and lacerations. The lack of ligature marks suggested manual strangulation, although the evidence was inconclusive. Victim's jaw was badly broken. A police officer with twenty-four years of experience who was admitted as an expert in crime scene investigation testified that this was "one of the more violent cases that [he had] seen."

{5}     Evidence of Victim's blood was found in multiple locations to which

Defendant had access. Evidence of her blood was found on a "significant area"—approximately one and one-half feet by two feet—in the cargo area of Victim's Honda CRV. This evidence was consistent with the placement of an object that was "very wet and very bloody but not . . . actively bleeding" in the cargo area of the Honda CRV. The armrest of the car also contained evidence of Victim's blood.

{6} The laundry room in the Roswell home Victim shared with Defendant had small, circular bloodstains in a pattern suggesting that a person was spitting or coughing blood while near the floor. There were additional stains in the laundry room higher up on the wall, approximately two to four feet from the floor. This was Victim's blood. Evidence of Victim's blood was also found on the clothes dryer, the wall adjacent to the laundry machines, and the floor of the laundry room.

{7} At a different Roswell property owned by Defendant—where he lived in a trailer before moving in with Victim—police found Victim's blood in a trash can on newspapers, a paper towel, an Allsups convenience store bag, and pieces of duct tape. Victim's blood was spattered on the Allsups bag, which indicated that the blood was flung through the air and onto the bag with enough force to break up the blood into small droplets. The newspaper was saturated with blood, meaning that it was in contact with a bloody object. One piece of duct tape was approximately four feet long with "staining all over." The duct tape was too stained with Victim's blood to

test for the DNA of someone who might have touched the tape. Despite all of the locations with Victim's blood described above, police concluded that there was another "scene [they] did not find" where Victim died.

{8} The State's expert in digital forensics testified that on the night of Saturday, March 4, 2017, into Sunday, March 5, 2017—approximately one day before Victim was found deceased on the morning of Monday, March 6, 2017—Defendant's phone was away from home nearly all night. More specifically, Defendant's phone was south and east of his home from approximately 8:00 p.m. to 10:00 p.m. on Saturday, and from 1:00 a.m. until at least 10:00 a.m. on Sunday morning.

{9} At about 10:00 a.m. on Sunday, Defendant's phone began moving north from where it had been all night. The expert testified that "the phone was very busy throughout [Sunday] up and down Roswell" and did not "become static at home" until almost thirteen hours later at approximately 11:00 p.m. Then, at 3:06 a.m. on Monday, March 6, Defendant's phone was again moving away from home, south and east of Defendant's residence. At 6:46 a.m. Defendant's phone was on the relief route off Highway 70 in northern Roswell, which is close to where Victim's body was found a few hours later.

{10} Victim's father and a Honda car dealership salesman each provided additional evidence. Victim's father testified that when he spoke with Victim by phone on

Saturday, March 4, they had a conversation about the marriage, and she told him that she was, in her father's words, "quite upset at the manner that [Defendant] would act." Victim's father told her that "since [the] relationship was quite wearing on her . . . the best thing to do would be to end it." They planned to talk the next day, which was the day before her body was found, but Victim did not answer any of her father's calls.

{11}     During their consensual interview with Defendant on the day Victim's body was found, the police had asked Defendant whether Victim's Honda CRV had GPS. The Honda dealership salesperson testified that a day or two after the murder, Defendant came to the dealership and started looking at the Honda CRVs on the lot and then inquired specifically about whether a Honda CRV had GPS and whether it could be tracked. The salesperson recognized Defendant because when Victim, a known customer, went missing, it was a "pretty big thing" to the dealership, and the social media information about the death included a photograph of Defendant. The salesperson noted that Defendant arrived at the dealership on a bicycle and wore a baseball cap. Following the incident, the salesperson contacted the police.[1]

---

[1]Defendant briefly contends that the salesperson improperly provided character evidence when he testified, in Defendant's words, that Defendant "did not behave like someone whose wife had died" and stated that Defendant was "'very weird.'" To clarify, the salesperson testified that Defendant's *demeanor* was . . . very weird." At trial, Defendant did not object to any demeanor testimony. The

{12}    Defendant maintained his innocence. Through his testimony at trial and a consensual interview with police, Defendant offered the following account of the events on the weekend Victim was murdered. Defendant stated that on Saturday afternoon Victim returned from a work visit in Hobbs, New Mexico. Defendant testified that on Sunday, the day of the alleged murder, Defendant left the house to work at some rental properties and run several errands. He said while he was out, Victim texted, stating that she was going for a walk. There was digital forensic evidence that Defendant's phone and Victim's phone were in proximity when this text was sent from Victim's phone and that Victim's phone was not at home. Additionally, evidence was presented indicating that Victim's phone was not locked and that Defendant used it after Victim went missing. Victim's phone, Honda CRV, car keys, and credit card were all at the house. Only the spare house key was missing. On Sunday night, Defendant called the police to report Victim missing.

---

salesperson's direct observation of Defendant's demeanor does not constitute evidentiary error, but even assuming that it was error, it was harmless. There is no reasonable probability that this unsolicited testimony affected the verdict, especially given the large volume of additional, more directly probative evidence of Defendant's guilt. *See State v. Fernandez*, 2023-NMSC-005, 528 P.3d 621, ¶ 24 (stating factors to assess the probable effect of evidentiary error); *State v. Tollardo*, 2012-NMSC-008, ¶¶ 25, 36, 275 P.3d 110 (establishing that nonconstitutional error is reversible only where there is a reasonable probability that the error affected the jury's verdict).

{13}     When speaking to the police on the day Victim's body was found, Defendant also stated that at Victim's workplace there was a big man with a dark complexion who made her uncomfortable. Defendant stated that he asked about this man and someone told him that the man with the dark complexion shoots up drugs. Defendant also stated during a pretrial interview with police that, to his knowledge, Victim had not been unfaithful. However, Defendant's former neighbor testified that sometime in May 2017, Defendant initiated the only conversation the two of them ever had. The neighbor testified that Defendant "came close to [him]" and asked, do "you know what happened with my wife?" Hearing that the neighbor did not know, Defendant, in the words of the neighbor, stated that "she went for a walk and she disappeared [b]ecause she had lovers. . . . She would meet men on the internet, . . . had a man that lived in Vaughn, New Mexico," and "[t]hey killed her with stabbings."

{14}     Defendant represented himself at the jury trial. After deliberating for approximately two and one-half hours, the jury convicted Defendant on all counts. Defendant appeals directly to this Court, as provided by Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA. Additional facts are provided as necessary in the discussion section to address Defendant's issues.

## II.  DISCUSSION

### A.  Lay Testimony Challenged by Defendant

{15}  In addition to the evidence set forth in the background section, the following evidence was also presented to the jury which Defendant asserts was improperly admitted, requiring a new trial. We disagree. We first set forth our standard of review, then discuss the items of evidence in turn.

### 1.  Standard of review for Defendant's evidentiary challenges

{16}  A challenge to a district court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *State v. Fernandez*, 2023-NMSC-005, ¶ 8, 528 P.3d 621. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007 (internal quotation marks and citation omitted).

{17}  Unpreserved claims of evidentiary error are reviewed for plain error. *State v. Montoya,* 2015-NMSC-010, ¶ 46, 345 P.3d 1056. To review for plain error, we "examine the alleged error[] in the context of the testimony as a whole." *Id.* (internal quotation marks and citation omitted). This Court will not conclude that there was plain error unless "convinced that admission of the testimony constituted an injustice

that created grave doubts concerning the validity of the verdict." *Id.* (internal quotation marks and citation omitted).

{18} Even where the Court concludes that error has been committed, it will not reverse unless there is sufficient prejudice. Nonconstitutional error and constitutional error are reversible but under different degrees of prejudice. Reversal on the basis of nonconstitutional error requires that there was a *reasonable probability* that the error affected the jury's verdict. *State v. Tollardo*, 2012-NMSC-008, ¶¶ 25, 36, 275 P.3d 110. But where an error results in an "intrusion on a distinct constitutional protection," this Court will reverse where there is a *reasonable possibility* that the error affected the verdict. *State v. Sena*, 2020-NMSC-011, ¶ 29, 470 P.3d 227 (internal quotation marks and citation omitted).

{19} The effect of constitutional error and nonconstitutional error is evaluated through the same lens:

> "When assessing the probable effect of evidentiary error, courts should evaluate all of the circumstances surrounding the error. This includes the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative. These considerations, however, are not exclusive, and they are merely a guide to facilitate the ultimate determination—whether there is a reasonable probability [or possibility] that the error contributed to the verdict."

*Fernandez*, 2023-NMSC-005, ¶ 24; *see also Tollardo*, 2012-NMSC-008, ¶ 43

(stating that constitutional and nonconstitutional errors are evaluated the same way and providing the language for the *Fernandez* distillation). The harmless error analysis is strictly case-by-case: "When assessing two cases that are factually analogous, with similar errors, the reviewing court thus may find the impact of the error harmful in one case and harmless in the other." *Tollardo*, 2012-NMSC-008, ¶ 44.

## 2. Testimony of Victim's hairdresser, supervisor, client, and coworker[2]

{20} Defendant argues that Victim's hairdresser, supervisor, client, and coworker offered improper character evidence under Rule 11-404 NMRA, and that this

---

[2]Defendant also challenges the admission of demeanor testimony from three law enforcement witnesses. First, the officer who questioned Defendant on the day Victim's body was found testified that Defendant smiled during the interview and did not cry when told that his wife was found deceased, unlike others the officer encountered in similar situations. Second, the officer who took the missing person report testified that Defendant laughed and smiled, and did not cry during their interaction. Third, a transport police officer testified—as characterized by Defendant in his brief—that Defendant "talked too much and did not behave like he really wanted to find his wife."

Although Defendant concedes that demeanor evidence can be admissible, Defendant contends that this "demeanor evidence was merely character evidence: describing [Defendant] as unconcerned, comparing his reactions to 'appropriate' reactions from innocent persons, and unnecessarily commenting on recorded evidence the jury was free to review itself." Defendant does not explain *why* he believes the demeanor evidence in this case is different than other, admissible demeanor evidence; i.e., why the evidence in the instant case is "merely character evidence." Defendant's argument is underdeveloped and unpersuasive. Defendant has not demonstrated that the uncontested admission of this evidence was plain error.

testimony was unfairly prejudicial and therefore inadmissible under Rule 11-403 NMRA.[3]

{21}    Victim's hairdresser of seven years and neighbor for three years testified that Victim changed after getting married to Defendant, especially during the latter part of the marriage, and that Victim was concerned about keeping her highlights the way Defendant liked them. At Victim's hair appointment on Wednesday, March 1, 2017, Victim told her hairdresser that the relationship was not, in the words of the hairdresser, "as great as [Victim] thought [it was] going to be." Three days before

---

[3]Rule 11-404(A)(1) provides that evidence is prohibited if used only "to prove that on a particular occasion the person acted in accordance with the character or trait." "Although character evidence is categorically inadmissible if it is relevant *only* to the defendant's propensity to commit the crime charged, it may be admissible to prove something other than propensity." *State v. Chavez*, 2024-NMSC-023, ¶ 16, 562 P.3d 521 (citation omitted). That is, evidence of a defendant's "crime, wrong, or other act" may be admitted to prove another relevant issue, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). "These examples of permissible uses are intended to be illustrative rather than exhaustive, and evidence of other wrongs may be admissible on alternative relevant bases so long as it is not admitted to prove conformity with character." *Chavez*, 2024-NMSC-023, ¶ 16 (internal quotation marks and citation omitted). Rule 11-403 provides that, regardless of the theory of admissibility, any relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

the murder Victim told her hairdresser that she was going to talk to Defendant about their relationship that weekend.[4]

{22}     Victim's supervisor testified that she contacted police after an incident where Defendant followed Victim and her supervisor to a joint client visit out of town. Defendant followed them in his vehicle from Roswell all the way to the building of the client. When the supervisor dropped Victim off after the trip, Defendant met them outside the home he shared with Victim and the first thing he said was that he denied stalking them.[5] Victim's supervisor not only contacted the police but also documented the incident in Victim's personnel file, stopped travelling in the same car with Victim because the supervisor was concerned for her own safety, and held meetings with Victim only in public spaces. The supervisor additionally testified that she documented, in Victim's personnel file, other times when Defendant "show[ed] up" at Victim's home visits to clients. Finally, the supervisor testified that she

---

[4]Defendant also makes a hearsay challenge to the hairdresser's testimony that Victim stated that she was going to speak with Defendant about their relationship. Defendant did not object to the testimony. Moreover, we agree with the State that this statement falls within the hearsay exception under Rule 11-803(3) NMRA, where the hearsay statement describes the declarant's then-existing state of mind, including "plan." Accordingly, we reject this challenge.

[5]Defendant objects that the supervisor characterized the incident as stalking, writing that Victim's supervisor "testified about an incident *she* considered to be stalking." But the supervisor did not offer that characterization. It was Defendant who used the term, as described by the supervisor in her testimony.

received multiple calls from Defendant over a prolonged period repeatedly checking whether Victim was with the supervisor when Victim and supervisor were meeting or travelling for work.

{23} Victim's client who lived in Carlsbad testified that Defendant accompanied Victim on almost every monthly visit. Defendant generally waited in the passenger seat of Victim's state-issued car. But at one of the earlier visits to which Defendant accompanied Victim, the client and her husband invited Defendant into the house because it was very hot—approximately ninety degrees outside—and Defendant was in the car with the windows closed and the engine off. Defendant reluctantly accepted the invitation. The client observed that Victim behaved differently than on other visits and cut the visit short. Victim seemed sufficiently uncomfortable that the client reported the incident to Victim's supervisor.

{24}   Victim's coworker testified that Victim "seemed more quiet" after she married Defendant,[6] that the coworker didn't feel comfortable going to the wedding,[7] and that Defendant stopped by Victim's office "[a]t least maybe twice a week." The coworker also testified that on Sunday, March 6, 2017, Defendant called her at about 11:00 p.m. from Victim's phone and that Defendant asked whether she had the phone numbers of any of Victim's friends.

---

[6]Defendant notes that this testimony was excluded pretrial. More precisely, testimony that Victim "seemed a little different" was excluded because it was deemed too vague and nonspecific to be relevant. However, Defendant did not object at trial. Even assuming that it was an abuse of the district court's discretion—i.e., untenable or not justified by reason, *Bailey*, 2017-NMSC-001, ¶ 12—for it not to have affirmatively interrupted the trial to address this testimony, the nonconstitutional error was harmless. The testimony was cumulative, and Defendant makes a minimal, nonspecific argument that the testimony was emphasized, but there was a large volume of additional, more directly probative evidence of Defendant's guilt. *See Fernandez*, 2023-NMSC-005, ¶ 24 (stating factors to assess the probable effect of evidentiary error). We conclude that there is no reasonable probability that, even if erroneously admitted, the coworker's testimony affected the verdict. *See Tollardo*, 2012-NMSC-008, ¶¶ 25, 36 (establishing that nonconstitutional error is reversible only where there is a reasonable probability that the error affected the jury's verdict).

[7]Defendant also seems to state that the coworker's testimony, "I just didn't feel comfortable going" to the wedding, was previously excluded, but we do not find evidence of that in the record, and Defendant has not provided any citation to the record establishing this exclusion. In any case, we are not obligated to search the record to support Defendant's argument. *See Muse v. Muse*, 2009-NMCA-003, ¶ 42, 145 N.M. 451, 200 P.3d 104 ("We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of counsel as to what occurred in the proceedings."). We therefore do not consider it separately from Defendant's main challenges to this testimony.

{25} We reject Defendant's Rule 11-403 and -404 claims that the district court erred when it admitted lay witness testimony regarding Defendant's demeanor and prior acts. This Court has, in this very context of domestic violence, deemed admissible prior acts that had similar probative value and carried much greater danger of unfair prejudice than the evidence at issue in the instant case. In *State v. Rojo*, this Court denied the defendant's prior bad acts challenge to evidence of prior violent acts against the victim. 1999-NMSC-001, ¶¶ 46-47, 126 N.M. 438, 971 P.2d 829. The evidence at issue was testimony that the defendant stated he would kill the victim; that the defendant stated he "wanted to die if the victim's family did not want her to marry him"; that the victim stated the defendant had hit her upon seeing her with another man; and that the victim once had a swollen mouth and black marks on her arm. *Rojo*, 1999-NMSC-001, ¶¶ 6, 12. The motive presented by the state was that the defendant killed the victim because she left her relationship with him to marry a different man. *Id.* ¶ 47. We reasoned that the evidence was admissible "[u]nder Rule 11-404(B)" because it was relevant to the defendant's motive for murdering the victim. *Rojo*, 1999-NMSC-001, ¶ 47. We also denied the defendant's claim that the evidence was unfairly prejudicial because "under Rule 11-403" his "prior acts had significant probative value in assessing the theories about the motive for the killing that both sides presented at trial." *Rojo*, 1999-NMSC-001, ¶ 48.

{26}     As in *Rojo*, the prior acts and demeanor testimony of the lay witnesses in this case was highly probative of Defendant's motive to prevent Victim from leaving the relationship. And while that testimony was prejudicial to Defendant, its prejudicial effect did not substantially outweigh the probative value of Defendant's motive to kill Victim. It was less likely to unfairly prejudice Defendant than the testimony in *Rojo* where, for example, the defendant stated he wanted to die if the victim's family opposed their marriage. Accordingly, we reject Defendant's claim that testimony from lay witnesses regarding Defendant's prior acts was unfairly prejudicial, inadmissible character evidence.[8]

**B.     Expert Witness Testimony Challenged by Defendant and Right of Confrontation**

{27}     Defendant contends that expert witness testimony offered by a nurse practitioner was not admissible. Defendant also contends that expert testimony was

---

[8]We also reject Defendant's argument that admission of the lay testimony requires a new trial under the cumulative error doctrine. Because there is very little error to accumulate, Defendant's cumulative error challenge fails. *See State v. Roybal,* 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61 ("The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial."); *State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814 ("In New Mexico the doctrine of cumulative error is strictly applied. It cannot be invoked when the record as a whole demonstrates that the defendant received a fair trial." (internal quotation marks and citation omitted)).

admitted which relied on an autopsy report prepared by a doctor who did not testify, which resulted in a violation of Defendant's confrontation rights under the Sixth Amendment to the United States Constitution. Defendant claims he is entitled to a new trial due under each of these arguments. We disagree.

**1.      Testimony of the expert nurse practitioner**

{28}     Defendant argues under Rule 11-401 NMRA and Rule 11-702 NMRA that the nurse practitioner's testimony did not assist the trier of fact because it was not individualized and therefore does not fit the test of relevance. Additionally, under Rules 11-403 and -404, Defendant argues that the expert nurse practitioner's testimony was improper character evidence and unfairly prejudicial. He characterizes the testimony as improper profiling evidence and contends that the nurse practitioner improperly "diagnosed [Victim's] murder as resulting from intimate-partner violence, created a portrait of the perpetrator's characteristics, and explained the cycle of violence that she claimed, without case-specific evidence, led

to it."[9] Additionally, Rule 11-401 requires that evidence be relevant. The test for relevant evidence is whether the evidence "has any tendency to make a fact more or less probable than it would be without evidence, and . . . the fact is of consequence in determining the action." Rule 11-702 provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

This Court has identified "three prerequisites" for the admission of expert testimony under Rule 11-702: "The first requirement is that the expert be qualified. . . . The second . . . is whether [the expert testimony] will assist the trier of fact. . . . The third requirement . . . is that an expert may testify only as to 'scientific, technical or other

---

[9]Defendant argues that the nurse practitioner offered improper character evidence by "cit[ing] select acquaintances' opinions that [Defendant] exhibited some traits from" a profile that the nurse practitioner created. Defendant does not cite the record for this purported testimony from the nurse practitioner discussing Defendant's characteristics and drawing parallels to domestic abusers. We are not required to search the record for this testimony. *Drake v. Rueckhaus*, 1961-NMSC-033, ¶ 14, 68 N.M. 209, 360 P.2d 395 ("[W]e will not search the record to determine that which appellant has the burden to point out to us under the rules."). Moreover, we note that the nurse practitioner specifically disclaimed any knowledge of the relationship between Victim and Defendant. Therefore, we discuss this argument no further.

specialized knowledge.'" *State v. Alberico*, 1993-NMSC-047, ¶¶ 43-45, 116 N.M. 156, 861 P.2d 192 (citation omitted).

{29}	This Court has described the test for whether an expert's testimony assists the trier of fact as "on *this subject* can a jury from *this person* receive appreciable help." *Id.* ¶ 44 (text only)[10] (citation omitted). "In this context, relevance is another way of referring to probative value, sometimes referred to as logical relevance." *Id.* ¶ 53. Given the "'liberal thrust' of the rules of evidence" and "judicial faith in the capability of jurors to sift through information," our courts resolve "'any doubt regarding the admissibility of scientific evidence . . . in favor of admission, rather than exclusion.'" *State v. Campbell*, 2007-NMCA-051, ¶ 13, 141 N.M. 543, 157 P.3d 722 (quoting *State v. Fry*, 2006-NMSC-001, ¶ 55, 138 N.M. 700, 126 P.3d 516); *see also* Fed. R. Evid. 702, advisory committee note to 2000 amendment ("[T]he rejection of expert testimony is the exception rather than the rule.").

{30}	We turn now to the evidence in question. In this case, expert witness testimony was given by a nurse practitioner who had twenty years of experience and was an instructor at the New Mexico Coalition of Sexual Assault Services, where she

---

[10]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

trained nurses to be sexual assault nurse examiners. She had extensive experience educating the general public, nurses, and public servants such as policemen and firemen, specifically about strangulation. She was qualified as an expert in strangulation and domestic violence, with no objection from Defendant.

{31} The nurse practitioner offered general background about intimate partner violence, explaining that abusers "track and keep track of their partners." She discussed the cycle of violence, including how violence in an abusive relationship escalates over time, reconciliation after violent acts, and circumstances where couples in an abusive relationship can also be "normal[]" and affectionate with one another. She further testified that "the most dangerous time for the victim is the two weeks after she decides to leave. . . . We find [that the abuser] gets very angry . . . and that anger tends to push [the abuser] to the point of retaliation. . . . It's one of the biggest causes of murder/suicide."

{32} The nurse practitioner discussed strangulation in particular. She explained the mechanics of strangulation, how the body is specifically damaged by strangulation, and that there is a relationship between strangulation and intimate partner deaths. She stated that manual strangulation—as opposed to strangulation by ligature—is uncommon outside of intimate partner violence. After looking at a sequence of autopsy photos that were admitted as evidence, the nurse practitioner concluded that

Victim had been strangled. This is consistent with the conclusion of the medical examiner, who also testified that Victim had been strangled. The nurse practitioner further concluded, based on her training and experience, that the strangulation injuries sustained by Victim are consistent with intimate partner violence.

{33} Defendant characterizes the nurse practitioner's testimony as irrelevant, nonspecific "profile evidence." However, the nurse practitioner's testimony is better understood as generalized expert testimony. Although New Mexico cases construing Rule 11-702 have not expressly discussed generalized expert testimony (nor, in a relevant context, profile evidence), Federal Rule of Evidence 702 has long incorporated the principle that generalized testimony by an expert can assist the trier of fact. *See* Fed. R. Evid. 702, advisory committee note to 1972 proposed rules (stating that the rule "recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts"). This principle was unaffected by the changes to Rule 702 made by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

{34} New Mexico appellate courts have allowed generalized expert testimony in numerous contexts. In *Alberico*, this Court held that an expert could testify that the complainant had symptoms consistent with PTSD caused by sexual assault in

general, but prohibited expert testimony "that the alleged victim [was] telling the truth." 1993-NMSC-047, ¶¶ 80, 84, 103. In *State v. Newman*, the Court of Appeals allowed general testimony regarding child sexual abuse "to assist the jury in understanding the behavior of sexually abused children, a subject beyond the knowledge of an ordinary juror." 1989-NMCA-086, ¶ 15, 109 N.M. 263, 784 P.2d 1006; *see also Campbell*, 2007-NMCA-051, ¶ 12 (collecting cases upholding admission of expert testimony "about the general characteristics of abused children" (internal quotation marks and citation omitted)). In *State v. Torrez*, we held that an expert's knowledge of "'gang-related law enforcement and gang culture'" was "admissible to prove motive or intent of a gang member, subject to the balancing requirements of Rule 11-403." 2009-NMSC-029, ¶¶ 22-23, 146 N.M. 331, 210 P.3d 228. Moreover, other jurisdictions have similarly allowed generalized expert testimony regarding domestic violence because it assists the trier of fact. *See People v. Cooper*, 2021 CO 69, ¶¶ 2-3, 496 P.3d 430 (allowing general testimony regarding domestic violence "if it has a sufficient logical connection to the factual issues to be helpful to the jury while still clearing the ever-present CRE 403 admissibility bar"); *Luna v. State*, 687 S.W.3d 79, 96-97 (Tex. Ct. App. 2024) (holding that the trial court did not abuse its discretion in admitting "expert testimony []as relevant and probative" regarding the power and control behaviors exhibited "in general" in

domestic violence relationships); *State v. Cox*, 842 N.W.2d 822, 830 (Nev. Ct. App. 2014) (concluding "that the nature of [the expert's] testimony regarding domestic abuse relationships and common characteristics of both abusers and victims was helpful to the jury because it assisted them in understanding and determining the issues closely related to the case").

{35} In the specific factual context of this case, the testimony that Defendant contends is relevant only to demonstrate propensity and is not a good fit in this case is instead highly relevant in demonstrating motive and helpful to the jury in understanding the dynamics of an abusive relationship. Defendant repeatedly argued that there was no domestic violence in the relationship. Both Defendant and his sister presented evidence that the relationship was loving and harmonious. Defendant's older sister, who knew Victim for more than twenty years and was Victim's coworker in the time leading up to the wedding, testified on Defendant's behalf. She testified that Victim was "a sweet, sweet lady." She stated that Victim and Defendant met at a "Christian concert" and that "God brought [them] together." Defendant's sister testified to a planned trip to Cancun with her husband, Defendant, and Victim. She testified that Defendant and Victim were "always loving . . . newlyweds. . . . all happy." When asked if Victim and Defendant argued, Defendant's sister testified

that they "would argue but funny. . . . just kind of yap. . . . teasing each other all the time." She stated that she "didn't see any fighting or nothing like that."

{36} Defendant asserts that the evidence presented by the State's witnesses who knew Defendant—for example, by travelling with Victim to out of town work appointments or coming to Victim's workplace regularly—could be understood as appropriate or beneficial. Defendant argued in essence that there was no motive for him to kill Victim.

{37} Thus, the expert testimony of the nurse practitioner assisted the jury in understanding that the testimony at issue could be understood as part of the dynamic of power and control that is central to domestic abuse. *See, e.g.,* *Cooper*, 2021 CO 69, ¶ 61 (approving of testimony that "the dynamic of power and control is at the root of domestic violence"). In the State's view, the motive for Defendant to murder Victim was to prevent Victim from leaving the relationship or to retaliate against Victim's expression of discontentment and Defendant's resultant loss of control. The State proved that motive with evidence of Victim's discontentment in the relationship revealed just prior to the murder: Victim was planning to confront Defendant about that discontentment, and Victim's father suggested to her that she consider ending the relationship because of her unhappiness with it. Of course, the end of a relationship does not ordinarily lead to violence. However, the nurse

practitioner testified that a relationship with a dynamic of intimate partner violence is different. In that context, stated the nurse practitioner, the decision to leave a relationship can be dangerous. She explained that manual strangulation injuries are consistent with intimate partner violence.

{38}     This framework helped the jury understand the State's theory that Defendant reacted to the potential loss of his relationship with Victim and that the motive for his violence was to retaliate and to retain control. It was also highly relevant and probative because it provided the jury with specialized information that explained abusive relationships. *See Cooper*, 2021 CO 69, ¶ 3 ("In evaluating the fit of generalized expert testimony, a trial court must be mindful of the purposes for which such testimony is offered—that is, the reasons why the proponent of the evidence has asked the expert to educate the jury about certain concepts or principles."). For these reasons, we reject Defendant's Rule 11-401, and Rule 11-702 challenges.

{39}     We note that admission of such general expert testimony is, of course, still subject to Rules 11-404 and -403. However, in this case, the nurse practitioner did not discuss Defendant specifically, or Victim's relationship with Defendant. The testimony did not lead to unfair prejudice because it was not inflammatory. *See Bailey*, 2017-NMSC-001, ¶ 16 ("Evidence is unfairly prejudicial if it is best characterized as sensational or shocking, provoking anger, inflaming passions, or

arousing overwhelmingly sympathetic reactions, or provoking hostility or revulsion or punitive impulses, or appealing entirely to emotion against reason." (internal quotation marks and citation omitted)). Therefore, we reject Defendant's argument that the nurse practitioner's testimony was unfairly prejudicial character evidence.

**2.      The Confrontation Clause challenge**

{40}      Defendant argues that his confrontation right under the Sixth Amendment to the United States Constitution was violated because he was unable to confront the medical examiner, Dr. Edelman, who prepared Victim's autopsy report.

{41}      In adjudicating these challenges, we for the first time recognize *Smith v. Arizona*, 602 U.S. 779 (2024), United States Supreme Court precedent addressing the application of the Confrontation Clause to expert testimony. In *Smith*, the Court concluded that the Confrontation Clause bars admission of a surrogate expert's opinion that is based on the out-of-court testimonial statements of an absent analyst. *See id.* at 783, 802-03. Undergirding that conclusion is the holding of the *Smith* Court that when "an expert for the prosecution conveys an out-of-court statement in support of [the expert's] opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at 795. *Smith* clarified the holdings of *Williams v. Illinois*, 567 U.S. 50 (2012), *abrogated by Smith*, 602 U.S. at 789. The *Williams* Court was unable to produce a majority opinion and

without a controlling rationale, *Williams* has "sown confusion" in Confrontation Clause jurisprudence. *Smith*, 602 U.S. at 788-89 (internal quotation marks and citation omitted).[11] We apply the *Smith* approach to the Confrontation Clause, which was anticipated by this Court in *State v. Navarette*. *See* 2013-NMSC-003, ¶¶ 13-14, 294 P.3d 435 (deriving from the fractured *Williams* opinion the principle "that an out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted").

{42} The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

---

[11]Indeed, our Court of Appeals has taken disparate approaches to the effects of *Smith*, applying it without concern in some instances, *see State v. Romanis-Beltran*, 2026-NMCA-024, ¶¶ 13-15, 585 P.3d 498 (applying *Smith* in the confrontation clause context), *cert. denied*, 2026-NMCERT-001, 585 P.3d 493; *State v. Gonzales-Gaytan*, A-1-CA-41660, mem. op., ¶¶ 3-5 (N.M. Ct. App. Mar. 24, 2025) (nonprecedential) (same); *State v. Bingham*, A-1-CA-40639, mem. op., ¶ 26 (N.M. Ct. App. Sept. 23, 2024) (nonprecedential) (same), and, in others, questioning whether *Smith* abrogates existing New Mexico law, *see State v. Rivera*, A-1-CA-42336, mem. op., ¶¶ 2-5 (N.M. Ct. App. Sept. 25, 2025) (nonprecedential) (recognizing without addressing the defendant's argument that *Smith* abrogated *State v. Navaratte*, 2013-NMSC-003, 294 P.3d 435, explaining in part that the Court of Appeals is bound by this Court's precedent under *State v. Mares*, 2024-NMSC-002, ¶ 34, 543 P.3d 1198), *cert. granted*, 2026-NMCERT-001, 548 P.3d 1225; *State v. Kellum*, A-1-CA-41306, mem. op., ¶¶ 6-11 (N.M. Ct. App. Apr. 23, 2025) (nonprecedential) (addressing the implications of *Smith v. Arizona* and grappling with whether it abrogates New Mexico caselaw), *cert. granted*, 2025-NMCERT-008, 575 P.3d 89.

witnesses against him." Its guarantee is procedural rather than substantive. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). As *Crawford* explained, the command of the Confrontation Clause is "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* Unless the absent witness is unavailable and the defendant had a prior opportunity to subject that witness to cross-examination, "the Clause bars the admission at trial of an absent witness's statements." *Smith*, 602 U.S. at 784.

{43} "But not always. The Clause's prohibition applies only to *testimonial hearsay*—and in that two-word phrase there are two limits." *Id.* (emphasis added) (internal quotation marks and citation omitted). First, the protections of the Confrontation Clause are only triggered by testimonial statements; nontestimonial statements are unprotected. *Id.* "Second . . . , the Clause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted." *Id.* (internal quotation marks and citation omitted).

{44} Over a sequence of cases, the United States Supreme Court has developed the contours of a defendant's confrontation rights with regard to forensic evidence, a term that encompasses autopsy reports. *See, e.g.*, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308, 311-12 (2009) (holding that the defendant's confrontation rights were violated where the state introduced into evidence "certificates of analysis"—

essentially affidavits—stating that lab tests identified a seized substance as cocaine, without testimony from the analysts who performed the tests); *Bullcoming v. New Mexico*, 564 U.S. 647, 651-52 (2011) (holding that the state could not introduce the written findings with a "testimonial certification" of one lab analyst through the "surrogate testimony" of a lab analyst who did not perform or observe the tests, nor sign the certification). The most recent of these forensic evidence cases, *Smith*, 602 U.S. 779, is most relevant here.

{45} The *Smith* Court held that "[w]hen an expert conveys an absent analyst's statements in support of [the expert's] opinion, and the statements provide that support only if true, then the statements come into evidence for their truth" i.e., are hearsay. *Id.* at 783, 800. And if the absent analyst's statements that have been conveyed are also testimonial, then the Confrontation Clause forbids an opinion on the basis of those statements. *Id.* at 784-85.

{46} Defendant objects to testimony from three witnesses—a substitute medical examiner Dr. Jarrell, the DNA analyst, and the nurse practitioner—whom he asserts relied on testimonial statements contained in the autopsy report prepared by Dr. Edelman, who did not testify. Defendant argues that Dr. Jarrell improperly opined that Victim was strangled. He also objects to Dr. Jarrell's testimony that DNA evidence found on Victim from Danny Mendes, was the result of cross-

contamination. Last, he objects to Dr. Jarrell's testimony that, in Defendant's words, "no signs of decomposition were observed by [Dr. Edelman] and [Dr. Edelman] observed [that Victim's] liver was blanchable." Defendant objects to testimony from the DNA analyst because the analyst tested swabs "based on how [Dr. Edelman] labeled them." Defendant argues the nurse practitioner violated his confrontation rights by relying on the autopsy report, but Defendant does not specify any statements.

{47} Citing *Smith*, Defendant argues that Dr. Jarrell—as a surrogate medical examiner witness—improperly relied upon the absent medical examiner's testimonial statements in the autopsy report to opine that Victim was strangled. Defendant identifies a single point in Dr. Jarrell's testimony where, in discussing an autopsy photograph of Victim, Dr. Jarrell stated that there was "bruising" from "something [that] came in contact with the neck and placed enough pressure for the blood vessels to burst and cause bruising" which "in association with the other findings of autopsy are consistent with strangulation." But this was the only reference to Dr. Edelman's autopsy report in Dr. Jarrell's testimony on strangulation. Dr. Jarrell relied repeatedly on autopsy *photographs*, State's exhibits here, to determine that Victim was strangled, and such photographs generally are not testimonial hearsay. *See State v. Smith*, 2016-NMSC-007, ¶ 44, 367 P.3d 420 (stating

that autopsy photographs of the victim's wounds are not statements and therefore are not hearsay; accordingly, use of such photographs does not implicate the Confrontation Clause).

{48} Testifying from another State's photographic exhibit, Dr. Jarrell stated that the hemorrhage she observed in the front of the neck also indicated strangulation. Based on this photograph, Dr. Jarrell stated that the fracturing of the hyoid bone she observed showed "significant pressure on the airway" and that "it's cons[iste]nt with strangulation." And, as noted previously herein, Dr, Jarrell's observation of neck bruising in the State's exhibit autopsy photograph was consistent with strangulation. In sum, Dr. Jarrell's conclusion that Victim was strangled was not testimonial because it was based not on the autopsy report, but on the autopsy photographs.

{49} As to the reason that Danny Mendes' DNA was found on Victim, Dr. Jarrell testified on the basis of personal experience, not the autopsy report. Dr. Jarrell testified as follows:

> [T]here was a meeting . . . where we were notified by . . . the individuals at the state lab who performed the DNA testing that there was this potential cross contamination. *I was present during the meeting and was the person at the OMI who was tasked to looking in what possibilities might have happened.* It was at that time we noted Mr. Mende[s'] autopsy was performed on the same table as [Victim] but about 24 hours prior to that one. At the time of [Victim's] autopsy, there [was] a place noted on the abdomen that was swabbed. We determined that through the use of the gray boards that were cleaned with just a substance that's not bleach and were used the next day, that

material dripped off that gray board onto her abdomen that was swabbed and positive for Danny Mende[s'] DNA.

(Emphasis added.) Because Dr. Jarrell did not rely on statements from Dr. Edelman for her testimony about DNA cross-contamination from Danny Mendes, we reject Defendant's argument that there was a Confrontation Clause violation on the basis of this testimony.

{50} The record does not dispositively settle whether the autopsy report was the basis for Dr. Jarrell's testimony that Victim's liver was blanchable and that there was no significant decomposition of Victim. But even assuming that it was, we conclude that any error does not require reversal because it was harmless.

{51} "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *State v. Thomas*, 2016-NMSC-024, ¶ 33, 376 P.3d 184 (internal quotation marks and citation omitted). Where an error results in an "intrusion on a distinct constitutional protection," this Court will reverse where there is a reasonable possibility that the error affected the verdict. *Sena*, 2020-NMSC-011, ¶ 29; *see also State v. Sisneros*, 2013-NMSC-049, ¶¶ 26-27, 32, 314 P.3d 665 (applying the same reasonable possibility standard to reversibility on a Confrontation Clause challenge). The harmless error analysis is strictly case-by-case:

When assessing the probable effect of evidentiary error, courts should evaluate all of the circumstances surrounding the error. This includes the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative. These considerations, however, are not exclusive, and they are merely a guide to facilitate the ultimate determination—whether there is a reasonable probability that the error contributed to the verdict.

*Fernandez*, 2023-NMSC-005, ¶ 24 (internal quotation marks and citation omitted); *see also Tollardo*, 2012-NMSC-008, ¶ 44 (stating that harmless error analysis proceeds on a case-by-case basis).

{52} We first note that Defendant moved the autopsy report into evidence; thus any erroneously admitted evidence based on that report is merely cumulative. Second, the prosecutor did not emphasize the testimony at issue. Moreover, and importantly, there is ample other persuasive evidence of Defendant's guilt, which we discuss in greater detail below addressing Defendant's sufficiency of the evidence arguments. Defendant is not entitled to a new trial on the basis of testimony that Victim's liver was blanchable and that there was no significant decomposition of Victim, even assuming it was erroneously admitted.

{53} We reject Defendant's challenge to the testimony of the DNA analyst because her testimony exclusively consisted of explaining findings from laboratory tests that she herself conducted. Indeed, Defendant's only allegation is that a Confrontation

Clause violation occurred because the DNA analyst relied on the labeling of the samples conducted by another party. Defendant argues that the DNA analyst improperly relied on the autopsy report because she relied on how the samples were labeled. But the DNA analyst did not bring in any statements made by Dr. Edelman in support of her conclusions. The DNA analyst made no conclusory statements about where the samples were taken from and instead answered each question by simply stating the results for each sample based on how it was labeled when she received it. In fact, it was Defendant who sought to establish where the samples came from, resulting in an objection by the prosecution and a clarification by the district court that the DNA analyst could not provide any more information than the label on each sample. Because the DNA analyst did not convey any out-of-court statements in her testimony but merely testified that she tested the labeled samples as received, we conclude that her testimony was not erroneously admitted.

{54} Defendant last argues that the nurse practitioner improperly testified on the basis of the autopsy but fails to inform the Court which statements violate the Confrontation Clause. We are under no obligation to search the record or construct arguments on Defendant's behalf. *See Muse v. Muse*, 2009-NMCA-003, ¶ 42, 145 N.M. 451, 200 P.3d 104 ("We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of

counsel as to what occurred in the proceedings."); *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (brackets, internal quotation marks, and citation omitted)).[12]

{55} For the reasons stated, we reject Defendant's argument that his confrontation rights under the Sixth Amendment were violated.

**C. Sufficient Evidence Supports Defendant's Counts One, Two, and Four Convictions**

{56} Defendant contends the evidence presented by the State fails to support his convictions. The evidence was plainly sufficient.

---

[12]We have nevertheless searched the record, and we reject Defendant's request for a new trial because the errors and potential errors we discovered are harmless. The nurse practitioner testified almost entirely about Victim's strangulation-related injuries from photographic exhibits, like Dr. Jarrell; there are, however, a few instances where the nurse practitioner either relied on or may have relied on Dr. Edelman's autopsy report for her testimony. We note the following testimony: "[T]he amount of bruising and blood clots seen on autopsy [called for] a lot of strength"; "I can't tell if there was a fracture [in the hyoid bone]. I read in the report that there was one, but it's hard to tell on this photo from where it is"; and "strangulation [is the conclusion] because of the injuries of the hyoid bone, petechia and the injury to the thyroid cartilage." We conclude that any error from admitting these statements was harmless for the same reasons noted in the harmless error analysis previously herein: The statements were cumulative and not emphasized by the State, and there is ample other persuasive evidence of Defendant's guilt. *See Fernandez*, 2023-NMSC-005, ¶ 24 (stating factors to assess the probable effect of evidentiary error).

**1.     Standard of review for sufficiency of the evidence**

{57}     When reviewing the sufficiency of evidence, we ask "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. We "view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.* This Court "does not weigh the evidence and may not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Id.*

**2.     Count one—first-degree murder**

{58}     Defendant challenges his first-degree murder conviction as charged in count one of the indictment, on the basis of both identity and requisite intent. There is ample evidence for a rational jury to have found, beyond a reasonable doubt, that Defendant was the person who killed Victim, and we summarize that evidence here. Evidence of Victim's blood was found in several locations in the laundry room of the marital home and in two different places in her Honda CRV. Bluestar Forensic reagents gave enhanced blood-evidence detection, and DNA testing provided subject identification. At a house Defendant owned separately from Victim, police located a bag with Victim's blood on it and duct tape covered with Victim's blood.

Defendant gave various conflicting stories about what happened to Victim, indicating to a neighbor that Victim had been stabbed by unidentified "lovers" that she had met online and suggesting to police that a man with a dark complexion who had been bothering Victim at work may have been the culprit. Defendant's cell phone was determined to have been on the move during the first night that Victim was missing and well into the following day. Defendant provided no explanation for his phone being away from home through the night. In addition, there was evidence of Defendant asking whether Victim's Honda CRV could be tracked, and Defendant's story regarding Victim's disappearance was inconsistent. Because substantial evidence identifies Defendant as Victim's killer, we therefore focus on evidence of intent.

{59} We conclude a reasonable jury could find Defendant killed Victim with deliberate intent, the required mens rea for first-degree murder. At trial, evidence was presented that Defendant inflicted three different injuries to Victim over a prolonged period of time. Defendant inflicted fatal blunt force trauma to Victim's head, and evidence supports that Victim lived up to twenty-four hours after the injury with no medical treatment. Testimony from the State's medical expert supports that such injury could have potentially caused the brain death; however, the expert testified that there was evidence of healing changes to the brain, which would occur

six to twenty-four hours after the injury.

{60}     The medical expert also provided testimony that Defendant then strangled Victim prior to her death. And, after inflicting blunt force trauma to Victim's head and strangling her, Defendant stabbed Victim in the chest twice. The medical expert testified that, due to the small amount of blood surrounding Victim's heart and chest, the stab wounds were likely perimortem, meaning the wound occurred around the time of death.

{61}     Each of these wounds, independently, was fatal and shows the willful and prolonged nature of Defendant's killing of Victim. *See Thomas*, 2016-NMSC-024, ¶ 41 (stating that a large number of wounds can indicate deliberation); *Rojo*, 1999-NMSC-001 ¶ 24 (holding that there was sufficient evidence of deliberation where the elaborate method of killing required "at least several minutes" to cause death and where there was evidence of the defendant's motive). Accordingly, substantial evidence of Defendant's deliberate intent supports his conviction, and we affirm his conviction, of first-degree murder.

**3.     Count two—tampering with evidence**

{62}     Defendant challenges the tampering with evidence conviction as charged in count two of the indictment. Jury instruction 8 requires that Defendant "hid OR

placed the body of [Victim]" and thereby "intended to prevent the apprehension, prosecution, or conviction of himself . . . for the crime of First Degree Murder."

{63}    Evidence was presented that Victim was deceased when placed where she was found and therefore had been killed elsewhere. Additionally, there was evidence that a large bloody object was placed in the back of Victim's Honda CRV. Victim's blood was found on the armrest of that car. Defendant had access to that car. And there was video footage of a car that matched the description of Victim's white Honda CRV in a location not far from where Victim was found during a time when Defendant's phone was in that proximate location. We reject Defendant's challenge to the sufficiency of the evidence and affirm his tampering with evidence conviction for count two.

**4.    Count four—tampering with evidence**

{64}    Defendant contends that the tampering with evidence conviction as charged in count four in the indictment is not supported by sufficient evidence. Count four required, among other possibilities, that Defendant "hid OR placed duct tape" and thereby "intended to prevent the apprehension, prosecution, or conviction of himself . . . for the crime of First Degree Murder."

{65}    A four-foot section of duct tape in the garbage can on a property owned by Defendant was stained with Victim's blood on both the smooth and adhesive sides.

It was sufficiently saturated with blood that testing for touch DNA was not feasible. We reject Defendant's challenge to the sufficiency of the evidence and affirm his tampering with evidence conviction for count four.

**D.      Defendant's Count Three Conviction Is Barred by Double Jeopardy**

{66}      Defendant challenges his count three tampering with evidence conviction, contending that it is not supported by sufficient evidence or, in the alternative, is barred by double jeopardy. Because we hold that the count three conviction is a violation of Defendant's right to be free from double jeopardy, we do not reach the sufficiency of evidence argument.

{67}      The Fifth Amendment protects defendants from being punished multiple times for the same offense. *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61. Defendant asserts a "unit of prosecution" argument; he claims he has been charged with two violations of tampering with evidence based on a single course of conduct. *See id.* To adjudicate double jeopardy claims, we look first to "whether the Legislature intended punishment for the entire course of conduct or for each discrete act." *Id.* ¶ 32 (text only) (citation omitted). Next, we consider whether the "offenses are separated by sufficient 'indicia of distinctness.'" *Id.* (internal quotation marks and citation omitted). We consider "timing, location, and sequencing of the acts, the existence of an intervening event, the defendant's intent

as evidenced by his conduct and utterances, and the number of victims." *Id.* ¶ 35. If it is unclear "to the jury which conduct it should consider to support each charge," the charges may violate double jeopardy. *State v. Cook*, 2006-NMCA-110, ¶¶ 17, 19, 140 N.M. 356, 142 P.3d 944. In *Cook*, the Court of Appeals held that two undifferentiated counts of tampering with evidence with identical jury instructions were barred by double jeopardy. *Id*. During trial, the state did not clarify for the jury which evidence related to each charge so the jury could have relied on the same factual basis for both charges. *Id*. ¶ 19. Because we have previously held that the Legislature has not clearly defined the unit of prosecution for tampering with evidence, *DeGraff*, 2006-NMSC-011, ¶ 35, we turn straight to whether Defendant's counts three and four tampering with evidence charges were based on multiple distinct acts or unitary conduct.

{68}    In this case, the jury instructions for counts three and four read:

For you to find the defendant guilty of tampering with evidence as charged in Count 3, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.    The defendant hid, changed OR destroyed blood/blood stains;

2.    By doing so, the defendant intended to prevent the apprehension, prosecution, or conviction of himself or another for the crime of First Degree Murder;

3.    This happened in New Mexico on or about or between the 4th day of March 2017 and the 6th day of March 2017.

and

> For you to find the defendant guilty of tampering with evidence as charged in count 4, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant changed, hid OR placed duct tape;
>
> 2. By doing so the defendant intended to prevent the apprehension, prosecution, or conviction of himself or another for the crime of First Degree Murder;
>
> 3. This happened in New Mexico on or about or between the 4th day of March 2017 and the 6th day of March 2017.

At first glance, it appears the jury instructions refer to different evidence for each tampering with evidence charge—count three for cleaning up blood stains at the marital home (1725 West Alameda) and count four for throwing away duct tape in a trash can at Defendant's trailer (5507 Seward). The State could have argued these were two distinct acts. However, during closing statements, the State said,

> Count 3, tampering with blood. We've got 1725 West Alameda. Yes, the evidence was decidedly mixed on that point. . . . But we also have other blood in this case at 5507 Seward. We've got Maria's blood on the Allsup's bag that's found in the trash can. So even if you're not convinced that there was tampering with the scene or tampering that took place at the scene at 1725 West Alameda, there was tampering with Maria's blood on the Allsup's bag found at 5507. Finally, [count 4,] there's the bloody duct tape. The tape that's got Maria's blood on it that's also found in that trash can at 5507 Seward.

Thus, the State invited the jury to rely on the blood stains on the Allsups bag for the factual basis of the count three conviction. The Allsups bag was thrown away in the

same trash can as the duct tape, which the State listed as the factual basis for the count four conviction. In *State v. DeGraff* we held that similar conduct was unitary when the defendant threw on the side of the road a box containing three items used in a murder. *Id.* ¶ 38. The State charged the defendant with three counts of tampering with evidence, one for each item in the box. *Id.* We reasoned that throwing a single box to a single location was unitary conduct, and therefore the defendant could only be charged with one count of tampering with evidence, not three. *Id.* ¶¶ 38-39. The same is true in this case. The evidence that Defendant tried to clean up blood stains was, as the State's closing put it, "decidedly mixed." Instead, the jury may have relied on the Allsups bag for the count three conviction. The Allsups bag and duct tape, both stained with Victim's blood, were found discarded in the same trash can. Throwing these items into the same trash can may have been unitary conduct so charging two counts of tampering with evidence for these actions, which "'may have been the same offense,'" is barred by double jeopardy. *See Cook*, 2006-NMCA-110, ¶ 17 (citation omitted). And "[i]n the absence of clear evidence [of discrete acts], we apply the rule of lenity and presume that the Legislature did not intend to impose multiple punishments on a single action." *DeGraff*, 2006-NMSC-011, ¶ 34. Therefore, we remand the case to the district court to dismiss count three.

**E.  Claims of Prosecutorial Misconduct**

{69}  Defendant contends that prosecutorial misconduct committed by the State requires that his convictions be set aside and that he receives a new trial. Some of Defendant's arguments were preserved by an objection at trial, and some were not. We discuss all of Defendant's claims and conclude no misconduct occurred which warrants granting Defendant the relief he seeks.

**1.  Standard of review**

{70}  Preserved and unpreserved arguments are reviewed differently. Claims of prosecutorial misconduct preserved by timely objection are reviewed for abuse of discretion. *State v. Trujillo*, 2002-NMSC-005, ¶ 49, 131 N.M. 709, 42 P.3d 814. This is a deferential standard, and this Court will not disturb the trial court's ruling unless it was "arbitrary, capricious, or beyond reason." *Id.* (internal quotation marks and citation omitted). Reversal is warranted under this standard only if "the prosecutor's improprieties had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Id.* (internal quotation marks and citation omitted).

{71}  Without an objection, the district court had no opportunity to rule on a claim of prosecutorial misconduct; nevertheless, this Court has the discretion to review such claims for fundamental error. *Id.* ¶ 52. "The doctrine of fundamental error is to

be resorted to in criminal cases only for the protection of those whose innocence appears indisputably, or open to such question that it would shock the conscience to permit the conviction to stand." *State v. Rodriguez*, 1970-NMSC-073, ¶ 10, 81 N.M. 503, 469 P.2d 148. "[W]e begin with the presumption that the verdict was justified, and then ask whether the error was fundamental." *State v. Sosa*, 2009-NMSC-056, ¶ 37, 147 N.M. 351, 223 P.3d 348. "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citation omitted).

{72} Under both abuse of discretion review and fundamental error review, "the reviewing court must determine whether the relative weight of [an] error meets the threshold required to reverse a conviction." *Sosa*, 2009-NMSC-056, ¶ 26. The touchstone of the prejudice inquiry is whether the defendant was deprived of a fair trial. *See Allen*, 2000-NMSC-002, ¶ 102 (concluding that there was prosecutorial misconduct but that it was not reversible error because it was not "prejudicial enough to deprive [the defendant] of a fair trial"); *cf. Sosa*, 2009-NMSC-056, ¶ 35 (concluding, in the context of evaluating closing argument error, that the ultimate objective of the reversible error analysis is to determine whether prosecutorial

misconduct deprived the defendant of a fair trial). Although the inquiry into whether prosecutorial misconduct rises to the level of reversible error "must be evaluated objectively in the context of . . . the trial as a whole," in *Sosa* we distilled three factors that are "useful guides." 2009-NMSC-056, ¶¶ 26, 34. First, "whether the statement invades some distinct constitutional protection"; second, "whether the statement is isolated and brief, or repeated and pervasive"; and third, "whether the statement is invited by the defense." *Id.* ¶ 26. "Only in the most exceptional circumstances should [this Court], with the limited perspective of a written record, determine that all the safeguards at the trial level have failed . . . [and] reverse the verdict of a jury." *Id.* ¶ 25.

**2.      Defendant's preserved prosecutorial misconduct claims**

**a.      Calling Defendant a liar**

{73}    At the outset, and as a point of clarification, Defendant slightly mischaracterizes the prosecutor's question. The prosecutor did not call Defendant a liar, as Defendant asserts. The prosecutor opened the cross-examination of Defendant by asking, "[Defendant], we've got a lot of lies to work through, would you agree?" This drew an objection, which was sustained.

{74}    Defendant does not provide any argument that there was a reasonable probability that this comment by the prosecutor prejudiced the verdict. Nor does

Defendant address the fact that the district court upheld his objection, which cuts against a conclusion that the district court abused its discretion. *See Allen*, 2000-NMSC-002, ¶ 100 (stating that where the prosecutor did not further emphasize an improper statement in closing, and there was no showing that the effect of the improper statement was not cured by the trial court's sustaining of the objection and admonition to the jury, the trial court did not abuse its discretion). Defendant does not contend, among his many arguments in this Court, that there should have been a mistrial on this ground. And there was ample evidence presented that there were in fact contradictions and tension between Defendant's testimony and the testimony of certain witnesses. The district court did not abuse its discretion and, even assuming error, there is no reasonable possibility that the verdict was affected by this question by the prosecution that was subject to an upheld objection.

{75} Relatedly, Defendant asserts, "[T]he prosecutor's statements about [Defendant] being a liar and questions asking [Defendant] to call other witnesses liars were plainly improper." Beyond this assertion, Defendant makes no argument. We therefore reject the assertion as beyond review. *See Dominguez v. State*, 2015-NMSC-014, ¶ 15, 348 P.3d 183 ("New Mexico courts will not review unclear arguments, or guess at what litigants' arguments might be." (text only) (citation omitted)).

**b.      Commenting on silence**

{76}     A former neighbor testified that Defendant told him Victim was killed by her lover from Vaughn, New Mexico. Defendant contends the prosecutor improperly commented on Defendant's right to remain silent by asking Defendant whether he also explained that suspicion to police.

{77}     This was not an improper comment on silence. First, it is not clear that Defendant ever invoked his right to silence, and Defendant has not so argued or pointed out where he might have invoked that right. Second, the period at issue was prearrest, and the use of prearrest silence to impeach is not unconstitutional. *State v. Gonzales*, 1992-NMSC-003, ¶ 29, 113 N.M. 221, 824 P.2d 1023, *overruled on other grounds by State v. Montoya*, 2013-NMSC-020, ¶ 54, 306 P.3d 426; *see also Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) (stating that "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted" and that "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative"). As the question at issue was not a comment on Defendant's silence, the prosecutor did not engage in misconduct and Defendant is not entitled to relief on this ground.

**c.     Eliciting previously excluded evidence**

{78}     Defendant complains that the State asked whether Victim's belongings were picked up from work, notwithstanding that proposed testimony that Victim's belongings were picked up from her office by her son was excluded pretrial as irrelevant. Defendant objected to the question, and the district court sustained the objection. Defendant does not explain any prejudice or how this might have affected the verdict. We conclude there was no error.

**3.     Defendant's unpreserved prosecutorial misconduct claims**

**a.     Misstating evidence**

{79}     Defendant argues that it was prosecutorial misconduct for the prosecutor to "repeatedly misstate[]" that Defendant "went to Cancun with another woman following [Victim's] death when there was no apparent evidence this ever happened." Defendant argues that this was error because it was improper for the prosecutor to refer to a matter outside of evidence. Given that the question "Did you go to Cancun?" went unchallenged by Defendant at trial, it is unclear whether the prosecutor had a good faith basis for this inquiry. Again, Defendant makes no argument about how this isolated question might have affected the verdict. The question does not shock the Court's conscience, and we conclude there is no reasonable probability that it affected the jury's verdict.

**b.  Eliciting testimony from police officers that implied Defendant's guilt had been determined**

{80}  Defendant contends that it was error for the prosecutor to elicit testimony detailing the warrant process, arguing the "State's intent . . . was to establish the police, prosecution, and courts had all determined [Defendant] was the murderer and the jury should defer to their judgment," which is improper. However, Defendant offers no argument about how this purported error affected the verdict.

{81}  With regard to the testimony about the warrant process, one of the two exchanges at issue is as follows:

> Q.  Tell us about the arrest warrant process, generally.
>
> A.  So arrest warrant, typically what we have to do is we have to present or produce an affidavit and establish enough probable cause in order to present to a judge. And once we've established the affidavit, we have placed the charges on the criminal complaint and then those are submitted to a judge, whether magistrate or district, to obtain the arrest warrant. It has to be filed, as well.

The other exchange described the process for obtaining a search warrant.

{82}  In *State v. Baca*, this Court found prosecutorial misconduct where, "in an effort to rebut [the defendant's] argument that the evidence was not sufficient to convict, the prosecutor stated that a magistrate judge had considered the evidence at a preliminary hearing and had determined that there was probable cause to believe [the defendant] committed the crimes." 1995-NMSC-045, ¶ 36, 120 N.M. 383, 902

P.2d 65. Thus, a "prosecutor may not imply that questions of guilt already have been decided by a judicial officer" because doing so "effectively usurps the function of the jury." *Id.* ¶ 37 (text only) (citations omitted).

{83}     Unlike the prosecutor in *Baca*, the prosecutor in this case did not tell the jury that "the judge had considered the evidence . . . and had determined that there was probable cause to believe Defendant committed the crimes." *Id.* ¶ 36. Instead, the prosecutor elicited testimony about what information must be submitted to a judge "to obtain the arrest warrant." While not an express statement that a judge determined there was cause to believe Defendant committed the crimes, as in *Baca*, the testimony nevertheless implies that a judge believed there was sufficient evidence to arrest Defendant. While we conclude that this implication was improper, we cannot say that the exchange shocks the conscience of the Court or renders Defendant's conviction fundamentally unfair. The jury instructions are of course quite clear about the required standard for conviction. *See State v. Benally*, 2001-NMSC-033, ¶ 21, 131 N.M. 258, 34 P.3d 1134 ("We presume that the jury followed the instructions given by the trial court."). Defendant's unpreserved argument on this point does not shock this Court's conscience and does not require a new trial due to prosecutorial misconduct.

**c.    Presenting misleading evidence of flight**

{84}    Defendant complains that the State elicited testimony that the police required assistance to arrest Defendant, "despite knowing that [Defendant] turned himself in during a pre-planned, work-approved vacation." There was no misconduct.

{85}    The testimonial exchange between the State and Sergeant Pablo Macias of the New Mexico State Police was as follows:

Q.    I wanted to ask you about your efforts made to apprehend the defendant in this case.

A.    Correct.

Q.    Did you have to engage in the help of additional law enforcement agencies?

A.    Yes we did.

Q.    [W]hich agencies?

A.    U.S. Marshals.

Q.    What do the marshals do?

A.    They were able to track [Defendant's] phone to place him in Minnesota.

Q.    And can you give us a timeline that this took once you involved the marshals to find the defendant?

A.    So we were able to identify that [Defendant] had been residing in Arizona. I believe he was informed that he did have an arrest warrant for his arrest, which was indicated to us that he was going to turn himself in at that point. A few days had passed, we

didn't hear anything from [Defendant]. And we decided to involve the U.S. Marshals to help us locate [Defendant]. At that point, they did obtain a warrant for his—search warrant for his phone and were able to track him and he was in Minnesota.

Defendant seems to suggest that because evidence was eventually presented that Defendant was on vacation in Minnesota, it was prosecutorial misconduct to ask about the efforts to apprehend Defendant. Without further explanation, we do not conclude that the evidence was erroneously admitted.

## III.   CONCLUSION

{86}    For the reasons stated, we affirm Defendant's count one, two and four convictions and remand the case to the district court for resentencing after dismissing count three which is barred by double jeopardy.

{87}    **IT IS SO ORDERED.**

                                               _____

                                               **MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____

**JULIE J. VARGAS, Chief Justice**

_____

**C. SHANNON BACON, Justice**

_____

**DAVID K. THOMSON, Justice**


_____

**BRIANA H. ZAMORA, Justice**